# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| RUSSELL BECKMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17 C 4551 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| CHICAGO BEAR FOOTBALL CLUB, INC., | ) | |
| and NATIONAL FOOTBALL LEAGUE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

It has been remarked that, at least in some parts of the United States, football is "next to religion, except for some people who [a]re really serious about football." President Clinton, Remarks by President After Viewing Movie - *Remember the Titans* (Sept. 26, 2000), *available at* 2000 WL 1424688, *1. This case about a fan's efforts to wear the gear of the team he supports arises under the First Amendment's free speech clause. The plaintiff, Russell Beckman ("Beckman"), has sued the Chicago Bears Football Club, Inc. ("Bears") and the National Football Association ("NFL"). He represents himself. On December 18, 2016, the Bears' staff allegedly denied Beckman entry into a Bears' pre-game experience at Soldier Field in Chicago because he was wearing Green Bay Packers (the Bears' opponent that day) clothing. Compl. ¶¶ III.A, B, ECF No. 1. Beckman seeks injunctive relief and court filing and service fees associated with this lawsuit. Compl. ¶¶ V.14, 15.

Defendants move under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted. The court concludes that Beckman has not established that he has standing to sue the NFL, but the complaint states a First Amendment claim against the Bears.

# I. FACTS

For purposes of deciding defendants' motion, the court assumes the following facts alleged in Beckman's complaint are true and draws all reasonable inferences from those facts in his favor. *See, e.g.*, *Manistee Apartments, LLC v. City of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016).

## A. The Bears Prevent Beckman from Participating in a Season Ticket Holder Experience While Wearing Packers Gear

Beckman is a personal seat license ("PSL") owner with season tickets to the Bears. Compl. ¶ III.C.1. From the Permit and Operating Agreement (the "Operating Agreement") and the Complaint, it appears Beckman is an "Initial Football PSL Licensee." Under the Operating Agreement, an "Initial Football PSL," means "the Football PSLs initially to be sold in connection with the financing of the Project and which are sold prior to the Final Completion." Resp. to Mot. to Dismiss ("Resp."), Ex. 1 at 11, ECF No. 24-1. The "Project," refers to the "adaptive reuse of Soldier Field." *Id.* at 14. Beckman is likely an "Initial Football PSL Licensee," because the Chicago Park District "started a nearly one billion dollar renovation of Soldier Field to accommodate the Chicago Bears," and Beckman "was offered an opportunity to purchase personal seat licenses in the new Bears home stadium." Compl., Ex. A at 2. Subsequently, Beckman "purchased two club seat personal seat licenses and obtained three other non-PSL seats in the south end zone." *Id.*

Beckman claims the Bears and the NFL violated his First Amendment right to free speech when he was denied access to the Bears' Pre-Game Warm-up Field Credential Experience ("PWFCE") because he was "dressed in opposing team gear." Compl. ¶ III.C.10. The PWFCE is part of a "program to reward season ticket holders," that was formally created by the Bears

prior to the 2016 football season. *Id.* ¶ III.C.3. Through the program, the Bears exclusively "reward" all Chicago Bears Season Ticket Holders ("STHs") with "points." *Id.* ¶¶ III.C.3, C.7. STHs can then redeem their points for "experiences," like the PWFCE. *Id.* ¶ III.C.3.

The PWFCE provides STHs and their guests the opportunity to walk and stand on the northeast corner and end zone of the Bears' playing field in Soldier Field during pre-game warm-ups. Compl., Ex A 10, Ex. D 1. The PWFCE credential, but not the "field pass," *id.*, Ex. A 16, provides that "[n]o visiting team clothing is allowed," Compl. Ex. D 1, as does the PWFCE registration confirmation email, *id.* Ex. A 14–15 ("NO OPPOSING TEAM GEAR WILL BE ALLOWED"), and terms within the STH Experiences mobile application, *id.* Ex. A 22 ("The terms posted on the STH Experiences mobile app specifically state that NO VISITOR CLOTHING will be allowed."). Additionally, the Bears assert that the STH Experiences are "subject to additional terms that may be set by the organization," including the "right, without refund or any amount paid, to refuse admission to, or eject any person . . . who fails to comply with venue or event promoter rules" as indicated on the "terms of purchase governing the STH Experiences redemptions." *Id.* pp. 26–27 (ellipsis in original).

Beckman received an email from the Bears on July 13, 2016, stating he had been awarded eleven points he could "use to purchase 'experiences,'" which he used[1] to "purchase three spots for the 'pregame warm-up field experience,'" for the Bears versus Packers game that would take place on December 18, 2016. Compl. ¶ III.C.3. Shortly before the December 18, 2016, game, Beckman received an email from the Bears[2] advising that "NO OPPOSING TEAM GEAR WILL BE ALLOWED," during the PWFCE on December 18, 2016. *Id.* ¶ III.C.4.

---

[1] On August 1, 2016. Compl. ¶ III.C.3.
[2] On December 12, 2016. Compl. ¶ III.C.3.

3

Beckman "informed the Bears that [he] would show up to the experience registration," wearing Packer clothing. *Id.* ¶ III.C.5. He was "denied participation in the experience." *Id.*

**B.  Beckman Writes the NFL Commissioner**

Beckman wrote NFL Commissioner Roger Goodell seeking Goodell's assistance in getting the Bears to stop enforcing their rule against visiting team apparel. *Id.* ¶ III.C.6. Goodell did not respond. *Id.*

**C.  Beckman Alleges That the Denial is Likely to Repeat Every Year**

Since the December 2016 game, Beckman has received additional offers to participate in Bears' experiences with his accrued points. *Id.* ¶ III.C.7. He characterizes this as a "repeatable annual event." *Id.* ¶ III.B. Indeed, the complaint states that Beckman received an email telling him he had 12 points for the 2017 season, and he intended to use them to purchase PWFCEs for the Bears-Packers game scheduled for November 12, 2017. *Id.* ¶ III.C.7. The Bears mobile app stated "[n]o visiting team clothing" was allowed at any game in the 2017 season. *Id.* ¶ III.C.7, 8. The Bears play the Packers at Soldier Field once each regular season according to the complaint and Beckman states that he has always worn Packer apparel to the team's home and away games. Compl. IV.12 (adding that this is "a long time tradition" for his family). Beckman purchased his season tickets in large part because he wanted to have the chance to enjoy the PWFCE with his friends and family, including future grandchildren. *Id.* ¶ III.C.2.

**D.  Soldier Field and the Operating Agreement**

The Bears[3] play home games at Soldier Field in Chicago. Resp. 9–10. Soldier Field is "a publicly financed facility owned by the Chicago Park District ("CPD")." Resp. 12. The Bears

---

[3] Also referred to as the "Club."

lease Soldier Field from the CPD under the Operating Agreement, which stipulates, among other conditions, that the Club must pay an annual "Facility Fee,"[4] to use the field. Resp., Ex. 1 at 45–46; *see also* Resp. 2, 8; Reply 6–7. According to the Operating Agreement, "the CPD shall be obligated to perform and pay the cost of all Routine Maintenance."[5] Response, Ex. 1 at 59. The CPD is also responsible for "performance and payment of security and crowd control on Game Days,"[6] with the exceptions of the "locker room[s], Team Areas and the Field." Resp., Ex. 1 at 70; Reply 6–7.

## II. LEGAL STANDARDS

Though the briefs discuss only the Rule 12(b)(6) standard, the NFL's standing challenge must be analyzed as a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). *See, e.g., Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017). The court therefore examines both standards.

### A. Subject Matter Jurisdiction (Rule 12(b)(1))

A Rule 12(b)(1) motion to dismiss allows a party to challenge the existence of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) motion raises either a facial or factual challenge to subject matter jurisdiction. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citing *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009)). A facial challenge claims that the complaint's, or another pleading's, allegations are insufficient,

---

[4] "Facility Fee," means "the annual fee (as such fee may be increased from time to time as provided herein) to be paid by the Club to the CPD in consideration for the Club's Use Rights with respect to the Facility, which is intended to reimburse the CPD for its actual expense." Resp., Ex. 1 at 8.

[5] Under the Operating Agreement, "Routine Maintenance," includes (but is not limited to) maintenance such as elevator maintenance, field maintenance, stadium cleanup, garbage removal, restroom supplied/maintenance, shuttle bus/parking part time help and snow removal in the "stadium." Resp., Ex. 1 at 59, Ex. B.

[6] As indicated in the Operating Agreement, "Game Day" means "the days on which the Bears Games are played at [Soldier Field]," and "Field," means the "playing field, end zone and sidelines."

while "[a] factual challenge contends that 'there is in fact no subject matter jurisdiction,' even if the pleadings are formally sufficient." *Id*. (quoting *Apex Digital*, 572 F.3d at 443–44) (emphasis omitted). Regardless of which type of challenge is raised, the plaintiff, as the party invoking federal jurisdiction, always bears the burden to establish that subject matter jurisdiction exists. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn–Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012).

The court analyzes the instant motion as a facial challenge augmented by Beckman's response. The portion of the pending motions on standing challenges the sufficiency of Beckman's complaint. The court also treats the statements in Beckman's response to the instant motion as though they were set forth in the complaint because they are consistent with it and because the NFL's reply analyzes Beckman's response in the same manner. In other words, the court affords the statements Beckman makes in his response the same presumption of truth as statements in a complaint receive on a facial challenge. *See Apex Digital*, 572 F.3d at 444 (discussing differences between facial and factual attacks and the district court's power to go beyond the pleadings and weigh evidence on a factual attack).

When determining if subject matter jurisdiction is proper on a facial challenge, "the district court must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor." *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015) (quoting *Reid L. v. Ill. State Bd. of Educ.*, 358 F.3d 511, 515 (7th Cir. 2004)).

**B. Failure to State a Claim (Rule 12(b)(6))**

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint. *Christensen v. Cnty. of Boone*, 483 F.3d 454, 458 (7th Cir. 2007). "To survive a [Rule 12(b)(6)] motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* When deciding a Rule 12(b)(6) motion, the court must "construe the complaint in the 'light most favorable to the' [plaintiff.]" *Zahn v. N. Am. Power & Gas, LLC*, 847 F.3d 875, 877 (7th Cir. 2017) (quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)). The court also assumes that all of the well-pleaded facts in the complaint are true and draws reasonable inferences in the plaintiff's favor. *See Iqbal*, 556 U.S. at 678; *Collins v. Vill. of Palatine*, 875 F.3d 839, 842 (7th Cir. 2017) (citing *McCauley v. City of Chicago*, 671 F.3d 611, 615–16 (7th Cir. 2011)); *Tagami v. City of Chicago*, 875 F.3d 375, 377 (7th Cir. 2017) (citing *United Cent. Bank v. Davenport Estate LLC*, 815 F.3d 315, 318 (7th Cir. 2016)). As Beckman repeatedly argues, "[a] document filed *pro se* is 'to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (*per curiam*) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (internal quotation marks and other citation omitted). Beckman repeatedly quotes a sentence from *Wilson v. Town of Clayton*, 839 F.2d 375, 378 (7th Cir. 1988): "a *pro se* civil rights complaint may only be dismissed if it is beyond doubt that there is no set of facts under which the plaintiff could obtain relief." (Citing *Shango v. Jurich*, 681 F.2d 1091, 1103 (7th Cir. 1982)). *Wilson*'s "no set of facts" language comes ultimately from *Conley v. Gibson*, 355 U.S. 41, 47 (1957). In *Twombly*, *supra*, the Supreme Court tossed the "no set of facts" formulation into the dustbin of

jurisprudence, saying that "[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard." *Twombly*, 550 U.S. at 563. Though the court construes Beckman's complaint liberally, it applies federal pleading standards as *Twombly* and *Iqbal* require.[7]

One last procedural matter: No party objects to the court's taking judicial notice of the Operating Agreement. Ordinarily, considering papers other than the complaint and anything incorporated into it, *see* Fed. R. Civ. P. 10(c), converts a Rule 12(b)(6) motion to one for summary judgment. *See* Fed. R. Civ. P. 12(d). Nonetheless, the court may take judicial notice under Federal Rule of Evidence 201 of matters of public record without converting a Rule 12(b)(6) motion. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991). The court does so here.

## III. STANDING

As it must, the court considers the NFL's challenge to Beckman's standing first. "In every federal case, the party bringing the suit must establish standing to prosecute the action. 'In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004), *abrogated on other grounds by Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Without

---

[7] Defendants also contend in their reply that Beckman's response reads like it was ghostwritten by a lawyer. ECF No. 25 at 1 n.1. The court acknowledges that cases recognize ethical issues ghost writing poses. *See, e.g., Gajewski v. Ocwen Loan Servicing, LLC*, No. 14-cv-9230, 2015 WL 3961611, at *1 n.1 (N.D. Ill. June 25, 2015). Beckman's response exhibits a sophistication and facility with legal concepts approaching that of someone who has received a legal education, but given the quality of the writing in his complaint, the thoroughness of the exhibits, and consistently clear manner in which he expressed himself in his letter to the NFL's commissioner, the court finds it hard to say whether the quality of his briefing results from ghost writing or an avid interest in the law. Due to the quality of the complaint and briefs, the principle that the papers receive a liberal construction has done little work here. Defendants may propound whatever discovery they wish at the appropriate time, but in these circumstances, the court needs something more concrete than above-average papers to take the unusual step of asking a litigant to state under oath whether someone wrote a legal brief for him.

standing, the court doesn't have the power to decide the First Amendment question presented at all. *See, e.g.*, *id.*; *Otrompke v. Skolnik*, 826 F.3d 999, 1000 (7th Cir. 2016).

To show standing, Beckman must establish that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61) (other citation omitted) (explaining that injury, traceability, and redressability are the "irreducible constitutional minimum" of Article III standing); *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 289 (7th Cir. 2016).

Only the NFL challenges standing. "'[A] plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)), and also for each defendant. *See, e.g.*, *Doe v. Holcomb*, 883 F.3d 971, 976 (7th Cir. 2018) (performing standing analysis by "tak[ing] each defendant in turn").

Defendants correctly concede that Beckman's complaint is sufficient to show that he suffered an injury in fact. Beckman seeks only injunctive relief stopping the Bears from enforcing a policy against opposing team apparel during the experience. Compl. IV.13, V.14. An injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). The injury-in-fact requirement demands something more than a generalization that the plaintiff intends to return "some day;" the plaintiff must have "concrete plans," or at least specify "when the some day will be." *Lujan*, 504 U.S. at 564. Beckman's complaint says that he is still a season ticket holder, that he received an email giving him enough points to purchase four experiences in the 2017–18

9

season, that he intended to go to a Bears-Packers game that was scheduled in November 2017, that he wanted to wear Packers gear and participate in the experience before that game, that the Bears' app said that the rule against opposing team apparel applies to the scheduled Bears-Packers game, and that the problem would repeat every year when Beckman attended a Bears-Packers game at Soldier Field. Compl. III.C.1, 7–10, 13. The NFL challenged none of Beckman's assertions, and the court has no reason to believe the Bears will change their rule against opposing team apparel next season. At this stage, Beckman's allegations satisfy the injury-in-fact requirement for the injunctive relief he seeks because he has pleaded that he has everything he needs to attend another experience, had concrete plans to do so on a specific date in 2017 and "there is an 'objectively reasonable likelihood' that such injury will occur" again based on his specific plans to keep going to Bears-Packers games in future seasons. *See Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

Traceability and redressability as to the NFL present more difficult problems. "Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000). Plaintiffs often sue state or federal officials to seek an injunction prohibiting enforcement of an allegedly unconstitutional law. When that happens, the plaintiff proves standing by "establish[ing] that his injury is causally connected to that enforcement and that enjoining the enforcement is likely to redress his injury." *Doe*, 883 F.3d at 975–76. Here Beckman must establish that the Bears' policy against opposing team apparel is causally connected to the NFL and that enjoining the NFL is likely to get him on the field wearing Packers gear. *Id.*

Beckman's complaint, even construed liberally, does not establish either proposition. As the NFL argues, the only things in Beckman's complaint tying his injuries to the NFL are his allegations that he wrote a letter on January 2, 2017, to the NFL's commissioner asking him to force or persuade the Bears to change their policy, and the commissioner didn't respond. Compl. III.C.6; letter from R. Beckman to R. Goodell, *id.* Ex. A. The Bears had already adopted and applied the policy when Beckman wrote his letter, and nothing in the complaint explains the relationship between the NFL Commissioner and the Bears. The complaint does recite that the NFL is "[a]n unincorporated association of 32 professional football teams," Compl. I.B, of which the Bears and the Packers are members, *id.* II.B.2.b, but leaves the details to guesswork. The simple fact that the Bears and Packers associate with the NFL does not show the policy Beckman challenges is fairly traceable to the NFL any more than any other organization—an advertiser, vendor, or a charity for instance—with which the Bears associate. Beckman must do more than show general association with the NFL to show traceability and redressability. *See Doe*, 883 F.3d at 976.

In his response to the pending motion to dismiss, Beckman tries to fill the standing gaps in his complaint. He represents that the NFL creates rules and policies governing players and teams, that teams must follow the NFL's constitution and bylaws, and that the Bears are "bound by the decisions of the NFL Commissioner and the decisions, rulings and action of the NFL's Executive Committee or other member clubs." ECF No. 24 at 17. He also tells the court that the NFL approved the Operating Agreement between the Bears and the Chicago Park District and that the NFL has issued "mandates" requiring member teams to change policies in the past, as when it required the Bears to begin conducting pat-down searches of fans in 2005. *Id.* When he wrote to the NFL Commissioner, concludes Beckman, the NFL could have forced the Bears to

change their policy; in Beckman's words, "The NFL has the opportunity and ability to impact the decision of whether or not the Chicago Bears lift the restriction or refrain from enforcement as alleged." *Id.* at 18–19.

The new representations in Beckman's response may demonstrate redressability. If what Beckman represents is true, the court could enjoin the NFL to force the Bears to change the challenged policy if Beckman wins on the merits because the Bears have to do as the NFL tells them. *See id.*

The court does not have the details of the NFL's constitution, by-laws, policies, or practices before it, however, and making a decision on redressability turns out to be unnecessary because even if Beckman's response is seen favorably to him, he still does not show that his injury can be fairly traced to the NFL. Beckman stresses that the Bears must follow NFL rules, but he does not identify any NFL rule, policy, or anything else that required, or even encouraged, the Bears to adopt the policy he challenges. *See id.* at 17–19. The NFL therefore stands in a position not unlike a state governor when a state law's constitutionality is challenged. The NFL has the general power to set policy and could presumably make the Bears change the policy at issue. But a governor's generalized duty to enforce state law does not create standing to sue the governor to enjoin the law's enforcement. *Doe*, 881 F.3d at 977. Beckman must instead show a more direct connection to the NFL—that the NFL "play[s] some role in enforcing" the challenged policy. *Id.* at 976–77. Beckman's letter to the NFL's commissioner, Compl. Ex. A, certainly demonstrates that Beckman thinks the NFL could play a role, but the letter, the complaint, and Beckman's response do not give the court any reason to think that it has played a role in the policy's enforcement or that the NFL is likely to do so in the future. The Bears' policy therefore appears to be a matter left by the NFL to the Bears' discretion on the present record.

Because the Bears' discretion appears to be unfettered, it breaks the chain of causation from Beckman's injury to the NFL.  *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976) (holding allegation that defendants "encouraged hospitals to deny services to indigents" by adopting rule did not show that denial of services (the injury) was fairly traceable to defendants because traceability does not reach harm that "results from the independent action of some third party"); *Segovia v. United States*, 880 F.3d 384, 388–89 (7th Cir. 2018) (holding injuries inflicted by voting law were not fairly traceable to defendants enforcing federal law "[g]iven that type of unfettered discretion" federal law left to Illinois; "plaintiffs cannot sue the federal government for failing to enact a law requiring Illinois to remedy their injury."); *DH2, Inc. v. SEC*, 422 F.3d 591, 597 (7th Cir. 2005) (holding alleged injury not fairly traceable to SEC rules because "to a significant degree, the injury [the plaintiff] complain[ed] of hinges on the decisions of independent actors whose discretion—though subject to securities laws and regulation by the SEC—is nonetheless quite broad"); *see also Ass'n of Am. Physicians & Surgeons, Inc. v. Koskinen*, 768 F.3d 640, 642 (7th Cir. 2014) ("The longer the causal chain, the less appropriate it is to entertain standing . . . .  To allow a long, intermediated chain of effects to establish standing is to abolish the standing requirement as a practical matter . . . .").

In sum, neither Beckman's complaint nor the statements on pages 17–19 of his response to the pending motion, ECF No. 24, establish that his injury is fairly traceable to the NFL.  The NFL must accordingly be dismissed for lack of subject matter jurisdiction.

### IV. THE FIRST AMENDMENT CLAIM

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the

government for a redress of grievances." U.S. Const. amend. I. The Bears argue that the First Amendment claim alleged in Beckman's complaint fails to state a claim for two reasons. First, as the Bears argue, Beckman is challenging their purely private conduct; the complaint, Operating Agreement, and other exhibits do not cross the threshold from private to state action. Alternatively, defendants maintain that the playing field is a nonpublic forum, and so the policy prohibiting opposing team apparel during the PWFCE is a reasonable, viewpoint neutral speech restriction.

The court finds neither argument persuasive at this procedural stage. An examination of the complaint and Operating Agreement reveals language that can be reasonably read as giving CPD the right to approve all PSL programs like the one at issue here. And the policy does not appear to be viewpoint neutral because it allows season ticket holders to wear Bears gear.

## A. The Complaint and Operating Agreement Make State Action Plausible

The Supreme Court has long held that "[f]reedom of speech and freedom of the press, which are protected by the First Amendment from infringement by Congress, are among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action." *Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938) (citing *Gitlow v. New York*, 268 U.S. 652, 666 (1925)) (other citations omitted). Because the Fourteenth Amendment "erects no shield against merely private conduct, however discriminating or wrongful," neither does the First Amendment when applied through it. *Murphy v. Mount Carmel High Sch.*, 543 F.2d 1189, 1193 (7th Cir. 1976) (quoting *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948); *accord Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988).

Beckman concedes that the Bears are organized as a private corporation, Compl. II.B.2.a, which does not qualify as a state actor. *See, e.g.*, *Peery v. Chi. Hous. Auth.*, 791 F.3d 788, 790–

91 (7th Cir. 2015) (holding private building owners were not state actors). He argues that his complaint and the Operating Agreement state a claim that the Bears and the Chicago Park District have a close enough relationship to satisfy the requirement of state action.

The court's first task is to identify the "specific conduct of which the [plaintiff] complains" because "constitutional standards are [applicable] only when it can be said that the State is responsible for" that "specific conduct." *Peery*, 791 F.3d at 789 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)) (second alteration in original). Beckman does not say that he has had, or thinks he will have, trouble getting into Soldier Field wearing Packers gear. Nor does he say that the Bears have interfered, or are likely to, with his ability to reach his seat and watch a game decked out in Packers garb. Zeroing in on the specific conduct, Beckman complains about the Bears adopting and communicating a policy prohibiting opposing team gear on the field during the PWFCE and then enforcing that policy on game day. *See* Compl. III.C.4–5, 8.

Having identified the specific conduct Beckman challenges as the adoption and enforcement of the PWFCE policy against opposing team apparel, the court applies the test for state action to that specific conduct. "At its most basic level, the state action doctrine requires that a court find such a close nexus between the State and the challenged action that the challenged action may be fairly treated as that of the State itself." *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 738 (7th Cir. 2015) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009)) (brackets omitted). The Supreme Court has articulated various tests used to inform that decision. They include the "symbiotic relationship test, the state command and encouragement test, the joint participation doctrine, and the public function test." *Id.* (quoting *Rodriguez*, 577 F.3d at 823–24). The Court has characterized the

state action inquiry as a "necessarily fact-bound inquiry." *United Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)).  "Over time, Supreme Court and Seventh Circuit precedent have revealed that these cases do not so much enunciate a test or series of factors, but rather demonstrate examples of outcomes in a fact-based assessment." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 816 (7th Cir. 2009) (citing *Brentwood*, 531 U.S. at 295 and *Tarpley v. Keistler*, 188 F.3d 788, 792 (7th Cir.1999)).  In the end, the court makes a "normative judgment" under which "[n]o one fact can function as a necessary condition [for state action] across the board" and no "set of circumstances [is] absolutely sufficient" to establish state action.  *Id.* (quoting *Brentwood*, 531 U.S. at 295–96).

Citing one case, Beckman makes much of the fact-specific nature of the state action test, arguing that issue is inappropriate for resolution without discovery.  The case he cites involved a company the City of Chicago allegedly formed "to serve as the city's agent as part of its efforts to bring the 2016 Olympic Games to Chicago." *Frayne v. Chicago 2016*, No. 08 C 5290, 2009 WL 65236, at *1 (N.D. Ill. Jan. 8, 2009).  This court agrees that, as a general matter, the need to make a normative judgment based on all the facts points toward the need for discovery when the complaint states a plausible claim.  *See id.* at *3; *see also Christopher, supra*, 536 U.S. at 406, 416 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513–515 (2002)) (explaining that First Amendment claims must satisfy notice-pleading requirements).  Nonetheless, Beckman does not claim that the CPD formed the Bears or, as explained in the following paragraphs, that the Bears

have a comparable relationship with the CPD.[8]  The complaint must still state a plausible claim

to unlock the door to discovery.  *See Frayne*, 2009 WL 65236, at *1 (citing *Tamayo v.

Blagojevich*, 526 F.3d 1074, 1083–83 (7th Cir. 2008)); *see also Christopher v. Harbury*, 536 U.S.

403, 406 (2002) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513–515 (2002)) (explaining

that First Amendment claims must satisfy notice pleading requirements).  Seventh Circuit case

law demonstrates that state action questions can and should be addressed at the complaint stage

when appropriate.  *See, e.g.*, *Lugar*, 457 U.S. at 939–42 (affirming dismissal of one count of

complaint on state action grounds and reversing dismissal of others); *Rodriguez*, 577 F.3d at

831–32 (same); *Hallinan*, 570 F.3d at 813–14, 821 (affirming dismissal of complaint because

"[t]he plaintiffs failed to plead adequately state action").

The cases just cited demonstrate that the state action requirement has teeth at the pleading

stage.  The court cannot accept Beckman's broad assertion that "an allegation detailing any

involvement is not required at this stage," Resp. 9, ECF No. 24.  Even though he represents

himself, Beckman must plead more than "labels and conclusions" on state action to survive a

Rule 12(b)(6) motion.  *Iqbal, supra*, 556 U.S. at 678 (quoting *Twombly, supra*, 550 U.S. at 555).

Beckman succinctly summarizes his state action position in his response to defendants'

motion to dismiss.  He asserts that his First Amendment rights were violated at a "publicly

owned, publicly financed facility."  Resp. 7.  He adds that the mere existence of the Operating

Agreement and its detailed nature demonstrate that the Bears and the CPD are "jointly engaged"

with one another.  *Id.* at 8–9 (quoting *Hallinan*, 570 F.3d at 815–16).

---

[8] The plaintiff's constitutional claims in *Frayne* were subsequently dismissed at summary judgment on grounds
unrelated to state action.  *See* 2009 WL 3229625, at *6–7 (N.D. Ill. Oct. 2, 2009).

As the cases the Bears cite suggest, the facts that Soldier Field was built with public money and that the CPD leases it to the Bears to hold football games probably aren't enough to make the Bears' policy prohibiting opposing team apparel during the PWFCE effectively a CPD decision.  In *Whitney v. Window to the World Communications, Inc.*, 837 F. Supp. 2d 854, 857 (N.D. Ill. 2011), for example, the court found the complaint of a plaintiff who was denied access to participating in a political debate on a public television station did not state a state action claim based on allegations that broadcasters are highly regulated and that the station leased the building from the state.  *See also Reinwand v. Nat'l Elec. Benefit Fund*, 683 F. App'x 516, 517 (7th Cir. 2017) (unpublished) (holding pension fund not state actor despite being heavily regulated by federal law).  Generally, allegations that a professional sports team leases public land, gets tax breaks, and some kind of public support, do not demonstrate that the team is a state actor when operating a sports facility, which is not a traditional governmental function.  *See, e.g.*, *Ludwig's*, No. 13-CV-6045 (MKB), 2016 WL 915102, at *9 (E.D.N.Y. Mar. 4, 2016); *Bessey v. Spectrum Arena, L.P.*, No. 11-CV-7099, 2011 WL 6779306, at *4 (E.D. Pa. Dec. 23, 2011); *Stark v. Seattle Seahawks*, No. C06-1719JLR, 2007 WL 1821017, at *8 (W.D. Wash. June 22, 2007); *see also Tarkanian*, 488 U.S. at 197–98 n.18 (holding that the coordination of amateur sports is "by no means . . . a traditional, let alone an exclusive, state function").  Here, however, the court has more than generalized allegations before it.  The parties agree that the court may consider the Operating Agreement between the Bears and CPD.

Regarding the Operating Agreement, the Bears' argument against state action hinges on provisions making the CPD generally "responsible for security and crowd control at Soldier Field."  *Chi. Park Dist. v. The Chi. Bears Football Club, Inc.*, No. 06 C 3957, 2006 WL

2331099, at *1 (N.D. Ill. Aug. 8, 2006). As the Bears point out, Article 25.1 carves out an exception to that general responsibility for the playing field on game days, however:

> Except for locker rooms, Team Areas and the Field, the CPD shall be responsible for the performance and payment of security and crowd control on Game Days. With respect to locker room, Team Areas and the Field, the Club shall be responsible for the performance and payment of security and crowd control on Game Days.

Operating Agreement § 25.1, ECF No. 24-1 at 70.

The Bears say that Section 25.1 effectively draws a line of responsibility around the field, making security the Bears' responsibility. Read in isolation, Section 25.1 seems to leave the CPD without any discretion to control who can be on the playing field on game days. Beckman disputes whether the place where PWFCE participants stand qualifies as the "field" (it might be just adjacent to the end zone), but he does not allege that CPD personnel provided security for the experience or worked at the desk where he tried to check in before the PWFCE. *See* Compl. II.C.5.

But Beckman is a PSL holder seeking to participate in a premium experience available to season ticket holders. Indeed, Beckman bought extra PSLs in 2016, so he could enjoy the PWFCE with friends and family. Compl. III.C.2. Here is what the Operating Agreement has to say about the Bears' PSL programs:

> All Bears PSL Programs and all Bears PSL Agreements for Bears Games shall be subject to the approval of the CPD. The CPD agrees that such approval shall be granted unless such Bears PSL Programs and Bears PSL Agreements materially violate the rules of public policy of the CPD.

Operating Agreement §11.2.5, ECF No. 24-1 at 41.

The parties do not discuss Section 11.2.5 in their briefing, but it is at least plausible that in Section 11.2.5, the CPD retained discretion to approve the PWFCE program at issue here.

19

Showing that a state actor retained discretion to approve a speech restriction goes a long way toward demonstrating state action, for it suggests the state's control over ostensibly private censorship. *See Brentwood*, 531 U.S. at 297 (discussing *Evans v. Newton*, 382 U.S. 296, 299–301 (1966), which held that private trustees to whom a city had transferred a park were nonetheless state actors barred from enforcing racial segregation, since the park served the public purpose of providing community recreation, and "the municipality remain[ed] entwined in [its] management [and] control," (quoting *id.* at 301) (alterations in original)); *Air Line Pilots Ass'n, Int'l . v. Dep't of Aviation of City of Chi.*, 45 F.3d 1144, 1149 (7th Cir. 1995) (holding that the First Amendment applied to corporation's decisions not to display certain advertising material where city's contract gave it discretion to control the contents of advertisements in airport); *see also Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995) ("[W]here . . . the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment."). Stated differently, the Operating Agreement, viewed favorably to Beckman, supports the conclusion that the CPD has remained "entwine[d] in the management or control" of Bears' programs for PSL holders, including the program here. *Brentwood*, 531 U.S. at 297.

Further bolstering that conclusion, the Operating Agreement allocates all revenue earned on game days to the Bears with the exception of parking. *See* Operating Agreement § 13.1.1, 13.2.3; *but see id.* § 13.2.6 (making exception for major NFL events like the Super Bowl to be negotiated with the NFL). An exception exists for a group of initial PSLs sold when the agreement commenced in 2001; the CPD gets the revenue from them. *See* Operating Agreement §§ 1.124, 11.1.1, 11.1.2. Beckman's complaint does not make clear whether he holds any initial

PSL's, but even if he does not, the Operating Agreement says that the Bears and the CPD expected to sell about 30,000 initial PSLs. *Id.* § 1.124. When combined with the parking and rental revenues, the inference that the CPD gets a sizable portion of the revenues from PSLs at Soldier Field becomes plausible. *See Airline Pilots*, 45 F.3d at 1149.

Taken together, the complaint and the Operating Agreement rise to the level of a plausible claim that the CPD and the Bears' operations are enmeshed enough to find a state action in the Bears' administration of PSL programs. Particularly because the inquiry is fact-intensive and no discovery has occurred, the court emphasizes that it determines only that Beckman has satisfied federal pleading requirements. *See* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief").

## B. The Complaint States a Claim of Viewpoint Discrimination

It is settled that "members of the public retain strong free speech rights when they venture into public streets and parks, "which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1982). The court employs "forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985); *see also Perry Educ. Ass'n*, 460 U.S. 37; *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974). These fora come in three varieties: the "traditional public forum," the "limited" or "designated" public forum, and the

"nonpublic forum." *Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Natural Res.*, 584 F.3d 719, 723

(7th Cir. 2009) (collecting cases and calling the categories "unhelpful First Amendment jargon").

A speech restriction in each type of forum requires a different level of scrutiny, *see Pleasant

Grove*, 555 U.S. at 469–70 (discussing doctrine), but "[t]he constant (applicable even to

nonpublic forums), is that regulation is not to be used as a weapon to stifle speech." *Ill.

Dunesland*, 584 F.3d at 724 (citing *Cornelius*, 473 U.S. at 800).

The parties disagree both about whether the public land where Beckman wishes to wear

his Packers gear is part of the "field" and into which category of forum that piece of land falls.

The Bears maintain that the field is a nonpublic forum in which speech can generally be most

highly regulated. Beckman disputes that vehemently. He argues that forum should be defined as

Soldier Field in its entirety or perhaps the separately demarcated space where PWFCE

participants must stand—in all events not the field. *See* Resp. 12–14, ECF No. 24 (citing

photograph attached to complaint). Soldier Field, continues Beckman, was built in 1924 as a

World War I memorial, and its history of use for public events (not yet specified in the record of

this case) shows it to be a public forum.[9] *See id.*

The court does not need to settle either dispute, however, because the complaint states a

First Amendment claim even accepting, for the sake of argument only, defendants' contentions

that the playing field is the pertinent forum and that it is nonpublic. Assume that the field is a

nonpublic forum. "Control over access to a nonpublic forum can be based on subject matter and

speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by

the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806 (citing *Perry Educ. Ass'n*, 460

---

[9] In *Marcavage v. City of Chicago*, 659 F.3d 626, 630 (7th Cir. 2011), the Seventh Circuit stated that "sidewalks like the ones outside Soldier Field and Wrigley Field are traditional public forums where the exercise of First Amendment rights is often most vibrant."

U.S. at 49) ("[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.").

In their emails, in their app, and by their actions the Bears differentiate between Bears gear, which is allowed, and "visiting" or "opposing" team apparel, which isn't. Compl. III.C.4, 8; *id.* Ex. A 22–23, Ex. D 1. The Bears say that the restriction doesn't depend on viewpoint because "[t]he restriction does not depend on who the visiting team is, the conduct of the team, or otherwise, but only on the structural fact of *whether the attire worn by the PWFCE participant is not that of the home team*." Mem. Supp. Mot. to Dismiss 12, ECF No. 19 (emphasis added). Answering the emphasized language requires a judgment not about a "structural fact" (whatever that phrase means) but a value-laden judgment about the degree to which any particular piece of apparel conveys a message that the wearer supports the visiting team. The policy does not regulate "structure" in the sense of requiring shoes to be worn before entering a public place, requiring a thick enough coat before going on a hike, or prohibiting metal cleats on a field. The Bears' policy takes aim at "speech printed on clothing, political symbols such as a swastika or a campaign button affixed to clothing, and masks and costumes that convey a political or other message." *Brandt v. Bd. of Educ. of City of Chi.*, 480 F.3d 460, 466 (7th Cir. 2007) (citation omitted); *see also id.* at 466–67 (discussing contextually sensitive inquiry needed to determine whether restrictions on clothing trigger the First Amendment). In context, even the color of clothing can convey a point of view and trigger First Amendment protection, as in the well-known case of wearing black armbands to protest the Vietnam War. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–06 (1969) (finding this to be "closely akin to 'pure speech'" receiving the greatest First Amendment protection (citations omitted)).

A few questions that might come up help to illustrate. Does a shirt with opposing team colors but no logo count? Will an unstylized printing of the opposing team name disqualify the wearer? Or is an official logo required? What about a shirt showing the logos of all NFL teams including the Bears and the visiting team? As the Bears say, they designed the experience "for Bears fans," and so the answers would presumably depend upon whether the particular item of apparel showed that its wearer was a Bears fan. Mem. Supp. Mot. to Dismiss 12.

Defendants try to analogize this case to a police officer enforcing the dress code of a private organization that has rented a public park. *See* Mem. Supp. Mot. to Dismiss 12. They say that requiring them to allow visiting-team attire during the PWFCE would violate their First Amendment rights by forcing them, as a condition of getting their permit, to convey a message they disapprove of—support for an opposing team. *See, e.g.*, *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995). Both arguments presume something not currently true, namely that there was no state action in creating the restrictive dress code in the first place. The point that if the ability "to exclude others from public property during the course of a limited, permitted use" were found to be a constitutional violation, "every picnic, wedding, company outing, meeting, rally, and fair held on public grounds would be subject to constitutional scrutiny," makes sense, but it illustrates the speech-chilling effect that finding state action would have in those circumstances. *Villegas v. Gilroy Garlic Festival Ass'n,* 541 F.3d 950, 957 (9th Circ. 2008) (*en banc*) (alteration and quotation omitted). Here the plaintiff has stated a plausible claim of state action. That means that the court must presume that the Bears' "seemingly private behavior 'may be fairly treated as that of the State [(here the CPD)] itself.'" *Brentwood*, 531 U.S. at 295 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). So while the Bears acting purely privately could exclude PSL holders wearing the other team's

gear from the PWFCE, the complaint states a claim that the CPD cannot, via the Bears, do the same thing any more than it could keep anyone wearing green (or not wearing green) out of Solder Field on St. Patrick's Day. *Cf. Brandt*, 480 F.3d at 466 (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 303–05 (1984)) (opining that "[i]f Irish people were forbidden to wear green on St. Patrick's Day, a natural form of protest would be to wear green on that day")

## V. CLASS ACTION ALLEGATIONS

Defendants also move to strike Beckman's class action allegations. *See* Fed. R. Civ. P. 23(d). Beckman concedes in his response that a *pro se* litigant can't represent a class because a class needs competent counsel to get anywhere, and so the court deems the class allegations withdrawn. Resp. 1 n1., 19; *see also Lawrence v. Sec'y of State*, 467 F. App'x 523, 525 (7th Cir. 2012); *Valentine v. WideOpen W. Fin., LLC*, 288 F.R.D. 407, 414 (N.D. Ill. 2012). The court will provide Beckman with an opportunity to amend his complaint. Any amended complaint should not include class allegations.

## VI. CONCLUSION

For the reasons stated, defendants' motion to dismiss and strike, ECF No. 18, is granted in part and denied in part. The complaint, ECF No. 6, against the NFL is dismissed without prejudice for lack of standing, and Beckman's class action allegations are withdrawn. Plaintiff Russell Beckman may file an amended complaint on or before April 23, 2018. A status conference is set for May 9, 2018, at 9:30 a.m.


Date: March 30, 2018                                        _____/s/_____
                                                            Joan B. Gottschall
                                                            United States District Judge