IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RUSSELL BECKMAN, ) | |
| ) | Case No. 1:17−cv−04551 |
| Plaintiff, ) | Hon. Joan B. Gottschall |
| ) | Magistrate Judge Jeffrey T. Gilbert |
| v. ) | |
| ) | **PLAINTIFF'S REPLY IN FURTHER** |
| CHICAGO BEARS FOOTBALL CLUB, ) | **SUPPORT OF HIS MOTION FOR A** |
| ET AL., ) | **TEMPORARY RESTRAINING** |
| ) | **ORDER AND PRELIMINARY** |
| Defendant. ) | **INJUNCTION** |

**INTRODUCTION**

Plaintiff Russell Beckman submits this Reply in further support of his Motion for and Memorandum in Support of a Temporary Restraining Order and Preliminary Injunction (ECF 45.) Defendant Chicago Bears Football Club (the "Bears") failed to raise any legally significant objections to Beckman's Motion in their December 5, 2018 Response (*see* ECF 47), and thus for the reasons stated below and in Beckman's initial Memorandum (*see* ECF 45), the Motion should be granted.

**QUESTIONS BEFORE THE COURT IN THIS HEARING**

Before this Court are the following questions:

1. Whether the inextricable entwinement between the Bears and the Chicago Park District ("CPD") in the management of Soldier Field, generally, and the Pre-Game Warm-Up Field Experience ("PWFCE") program specifically, means that Beckman has some likelihood of success on the merits in the underlying litigation;

2. Whether in a case involving Beckman's First Amendment rights, he will suffer irreparable harm if the injunctive relief is not granted;

1

3. Whether any adequate remedy exists if Beckman is barred from wearing his jersey of choice while participating in an experiential event—Sunday's PWFCE—which, once it is gone, it is gone forever; and

4. Whether, when weighing the respective harms to the parties, it is clear that the Bears will suffer little or no harm by allowing Beckman to wear an opposing team's jersey at the PWFCE—particularly when the Bears host separate, non-PWFCE programs just steps away from where the PWFCE is located, that allow opposing team fans to wear the jersey of their choice.

## ARGUMENT

### I. THE BEARS HAVE NOT ANSWERED BECKMAN'S ARGUMENTS THAT HE MEETS THE STANDARD FOR OBTAINING PRELIMINARY RELIEF.

To obtain preliminary relief, Beckman "must make 'a threshold showing: (1) that [he] has some likelihood of success on the merits of the underlying litigation; (2) irreparable harm to the plaintiff; and (3) no adequate remedy at law.'"[1] *Savis, Inc. v. Cardenas*, No. 18 CV 6521, 2018 WL 5279311, at *8 (N.D. Ill. Oct. 24, 2018) (Gottschall, J.) (citation omitted). Beckman's initial pleadings and his memorandum in support of the present motion have done so, yet the Bears' response offers no legally significant answer.

### A. The Bears' Response Ignores Beckman's Argument that It is a State Actor Since the Bears and the Chicago Park District are Inextricably Entwined in the Operation of the Bears' Policy.

The "state action requirement has teeth at the pleading stage," as this Court observed in its initial ruling on the Bears' motion to dismiss the complaint. *Beckman v. Chicago Bear Football Club, Inc.*, No. 17 CV 4551, 2018 WL 1561719, at *7 (N.D. Ill. 2018). But Beckman need not establish conclusively the existence of state action, either to survive a motion to dismiss

---

[1] It is well-settled that "monetary damages cannot replace the loss of protected First Amendment rights, even if those losses were temporary." *Hatchett v. Barland*, 816 F. Supp. 2d 583, 607 (E.D. Wis. 2011); *Nat'l People's Action v. Vill. of Wilmette,* 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages"). The Bears do not address this point.

or to show that he is entitled to preliminary relief. Because "the [state action] inquiry is fact-intensive," when "no discovery has occurred," a plaintiff is not required to prove that the defendant is a state actor. *Id.* at *9. The standard applicable to this motion is that Beckman "must make 'a threshold showing that the movant has *some likelihood of success* on the merits of the underlying litigation.'" *Savis*, 2018 WL 5279311, at *8 (citation omitted and emphasis added). Beckman's allegations, the Operating Agreement between the Bears and the CPD, and Beckman's submissions in support of the current motion, meet this standard. The Bears have said nothing to contradict this conclusion.

As this Court recognized in its initial ruling on the Bears' motion to dismiss, Beckman's argument that the Bears are a state actor in the context of this case rests, in large part, on his claim that the Bears and the CPD are so entwined in the administration of the challenged policy that "seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (citation omitted); *and see Beckman*, 2018 WL 1561719, at *9 (quoting *Brentwood* and evaluating Beckman's state action claim as one that "the CPD has remained entwine[d] in the management or control' of Bears' programs"). Beckman's memorandum in support of his motion for preliminary relief expressly described his state action argument in these terms. Plaintiff's Memorandum in Support of Motion for a Temporary Restraining Order and Preliminary Injunction (ECF 45), at 6 ("Plf's Mem.").

The Supreme Court explained in *Brentwood* that entwinement is a rationale for finding state action quite distinct from other forms of state action analysis. "Entwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and

judged by constitutional standards." Where "the facts justify a conclusion of state action under the criterion of entwinement," arguments that "the facts would not support a finding of state action under various criteria applied in other cases . . . are beside the point." *Brentwood*, 531 U.S. at 302.

The Bears' response does not mention entwinement at any point. Instead, the response asserts that Beckman's state action argument "*hinges on*" the claim that the CPD "has a contractual right under the Operating Agreement to approve" the Bears' policy or that his argument "*boils down to* citing Section 11.2.5." Defendant's Response (ECF 47), at 6 ("Def's Resp.") (emphasis added). These assertions are simply erroneous. Of course, the almost 100-page Operating Agreement that governs the relationship between the Bears and the CPD is relevant to the state action issue, as is the scope of section 11.2.5—the proper construction of which is at issue[2]—and the extent to which, in practice, the CPD and other municipal agencies are involved in the Bears' operations. Because Beckman is arguing that the Bears are a state actor in this situation given the degree of their entwinement with the CPD, the Court can and should consider anything relevant that is before it, including the photographs Beckman has submitted showing the presence of local police officers apparently providing security at a pre-

---

[2] The Bears' claim that the affidavits submitted with their response "establish that there is no state action" entirely misstate any significance that the affidavits might have. (Def's Resp. at 10). These affidavits assert *the views of the affiants* on, among other things, the contractual obligations of the CPD and the Bears, and nothing more. Even if accurate, the affiants' views could not be "fatal to" or "refute[]" Beckman's state action arguments. (Def's Resp. at 9). The existence of state action is ultimately a question of law, and because the inquiry is fact-intensive, "no one fact [is] a necessary condition" in determining the answer. *Brentwood*, 531 U.S. at 295. In addition, as explained below, Mr. Pierce's affidavit is an unreliable guide to the operation of the Bears' policy. *See supra* Sec. III.

game event.[3]  *See* Beckman Affidavit (ECF 48-1), at ¶¶ 11-13 and Aff. Ex. 1.   But the Bears' attempt to recharacterize Beckman's argument (Def's Resp. at 6-7) and then refute a state action argument that Beckman is not making—that the Bears are a state actor simply and solely by operation of section 11.2.5—is "beside the point." *Brentwood*, 531 U.S. at 302.

### B. The Bears Offer No Answer to Beckman's Argument That Their Policy is Viewpoint Discrimination in Violation of the First Amendment.

The Bears make no attempt to answer Beckman's argument that he has shown at least "some likelihood of success on the merits" as to his substantive First Amendment claim that their policy represents prohibited viewpoint discrimination if they are a state actor in this context.  *See* Plf's Mem. at 4-5.  This Court has already noted that "the policy does not appear to be viewpoint neutral." *Beckman*, 2018 WL 1561719, at *6. The Bears' silence concedes the point for the purposes of the current motion.

### C. The Bears Offer No Persuasive Answer to Beckman's Argument That He Will Suffer Irreparable Harm If Preliminary Relief is Denied.

"[E]ven short deprivations of First Amendment rights constitute irreparable harm." *Higher Soc'y of Indiana v. Tippecanoe Cty.*, 858 F.3d 1113, 1116 (7th Cir. 2017).  In the memorandum accompanying Beckman's motion, Beckman explained why the usual presumption applies in his case.  (Plf's Mem. at 10).  The Bears first respond by arguing that the presumption of irreparable injury in First Amendment cases arises only "after the movant establishes the likelihood of a constitutional violation."  (Def's Resp. at 10).  Since the Bears do not contest

---

[3]  Indeed, the Bears apparently regularly use and rely on local public police forces, such as City of Chicago police officers and perhaps Park District police officers, to patrol and secure Soldier Field during Bears' events and games. *See also* https://perma.cc/2X58-CWES (showing in lower right corner of first two photos in post that the Bears' also used City of Chicago police officers to secure Soldier Field during their November 18, 2018 game against the Minnesota Vikings).  For purposes of the state actor entwinement analysis, it warrants some consideration that local police officers help control access to Soldier Field during events like the Bears-Packers PWFCE at issue in

Beckman's substantive viewpoint-discrimination argument, this response simply reiterates their unpersuasive argument that he has not shown "some likelihood of success" in persuading the Court that they are a state actor. For the reasons already stated, the Bears have not addressed, and certainly have not rebutted, Beckman's entwinement-based state action claim. Beckman meets the standard for asserting irreparable injury.

The Bears also argue that Beckman cannot assert irreparable injury because he, or his counsel, have delayed improperly in seeking preliminary relief. (Def's Resp. at 11-12). Until he obtained counsel, Beckman represented himself *pro se* and "his pleadings in the district court [should] be construed liberally." *Edwards v. Cross*, 801 F.3d 869, 873 (7th Cir. 2015). In his complaint, Beckman asked for relief against the Bears' policy in general terms, which put the Bears on notice that he was seeking what a lawyer would understand to be injunctive relief. As indicated by the timeline in Beckman's affidavit, less than a month lapsed between Beckman's counsel beginning work on his case and counsel filing the current motion for preliminary relief. *See* Beckman Affidavit (ECF 48-1), at ¶¶ 4-10. There is thus no factual basis for the Bears' argument that Beckman has forfeited his claim of irreparable injury by undue or unnecessary delay.

II. **THE BEARS HAVE NOT REBUTTED BECKMAN'S ARGUMENT THAT THE BALANCE OF HARMS AND THE PUBLIC INTEREST SUPPORT A GRANT OF PRELIMINARY RELIEF.**

"[T]he balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed" by enjoining state action that is likely to violate the First Amendment. *Higher Soc'y*, 858 F.3d at 1116. "Stated differently, 'injunctions protecting First Amendment freedoms are always in the public interest.'" *ACLU of Illinois v. Alvarez*, 679 F.3d

583, 590 (7th Cir. 2012) (citation omitted). The Bears attempt to avoid application of this settled principle by arguing that "the First Amendment is a two-way street in the sense that it protects both a person whose speech is unconstitutionally restricted by a state actor and a private actor's ability to restrict speech with which it disagrees." (Def's Resp. at 13). This assertion is both circular (it assumes that the Bears are a private actor for the purposes of this motion) and legally inaccurate. It is true that in some circumstances, courts must find an "accommodation" between freedom of speech and interests protected by other constitutional provisions (*not* the First Amendment), but in doing so, "'the courts properly have shown a special solicitude for the guarantees of the First Amendment.'" *Bessey v. Spectrum Arena, L.P.*, 2011 WL 6779306, at *7 (2011) (quoting *Lloyd Corp. v. Tanner*, 407 U.S. 551, 567–68 (1972)). But this case does not present the Court with such a situation.

*Bessey v. Spectrum Arena*, on which the Bears rely (Def's Resp. at 13, 14), illustrates the flawed nature of the Bears' argument.[4] *Bessey* was a case about a claimed First Amendment right to prevent (as far as possible through protest and picketing) the success of a private commercial venture. The plaintiffs there had no interest in attending the theatrical event the defendants were presenting. They wished instead to protest the event, had purchased tickets only as part of an effort to continue their protests, and sought an injunction permitting them to engage in picketing designed to dissuade potential patrons from attending the performance.[5] *Bessey*,

---

[4] *Bessey* did not analyze an entwinement state action argument. Instead, it discussed the "governmental function" and "symbiotic relationship" strands of state action doctrine. *Id.* at *4–5. As discussed above, *Brentwood* teaches that state action through entwinement can be found on facts that would not support the same conclusion on other grounds. *Bessey* also engaged in forum analysis–again, an issue not before the Court. *See id.* *5–6.

[5] The injunction the *Bessey* plaintiffs sought would have permitted them to set up stationary signs, folding tables that would hold literature about their cause, as well as flat screen televisions depicting videos about the treatment of animals, to carry about televisions as part of their protest, and to attempt to dissuade patrons from attending the event. *Id.* at *1.

7

No. 11-CV-7099, 2011 WL 6788938, at *1.  The Defendants' policy against such activity, on the other hand, involved no viewpoint discrimination and was even-handed in application.  *Id.* at *3, *5–6.

The *Bessey* court concluded that if awarded an injunction, the plaintiffs would not only interfere with the defendants' property rights but also "directly interfere with [the defendants'] commercial interests and the enjoyment of their patrons" by impeding access to and enjoyment of the event.  *Id.* at *7.  The district court also concluded that the defendants' private interests were supported by "a legitimate countervailing interest in the public's right to attend entertainment events free from solicitations and protest demonstrations that are incompatible with the enjoyment they seek."  *Id.*  *Bessey* patently has no application to this case.  Beckman is an ardent football fan eager to watch Bears' games and participate in related events.  Other than a conclusory assertion that the Bears have a commercial interest in enforcing their policy against Beckman, nothing in the present case suggests that Beckman would cause any "direct" interference with the Bears' ability to conduct their commercial enterprise.  Nor have the Bears made any assertion, conclusory or otherwise, that Beckman would interfere with any other patron's enjoyment of pre-game warmup events.  Unlike the *Bessey* defendants, the Bears do not allege any specific sense in which they will suffer a commercial or concrete injury; the interest they assert appears to be a pure interest in excluding certain viewpoints from certain events otherwise open to individuals who have purchased tickets.

**III.**     **THE PIERCE AFFIDAVIT SUPPORTS THE CONCLUSION THAT THE BEARS HAVE NOT REBUTTED BECKMAN'S STATE ACTION ARGUMENT.**

One of the two affidavits the Bears submitted along with their response to the present motion was executed by Brendan Pierce, the Bears' Director of Ticket Sales and Service.  Mr.

Pierce states that his duties "include managing the Season Ticket Holder Experiences program, known as the 'STH Experiences' program." Pierce Affidavit (ECF 47-3), at ¶ 3. Beckman agrees that the actual operation the Bears' STH program is relevant to the question of whether the Bears are a state actor in enforcing their challenged, viewpoint-discriminatory policy. But the reliability of Mr. Pierce's affidavit as an accurate picture of the Bears' operation is undermined by the fact that the affidavit appears to directly contradict the Bears' own website with respect to the relevance of holding a personal seat license ("PSL") to receiving benefits under the STH program. Mr. Pierce asserts at paragraph 6 that "[o]wning a PSL does not impact eligibility, how points are awarded, or degree of participation in the STH Experiences program." However, as explained in Beckman's affidavit, the Bears' website states that "'all season tickets located in the United Club require a PSL,' and that such season tickets provide the holder with extra "STH Experiences points per seat to use on pregame field access.'" Beckman Affidavit (ECF 48-1), at ¶ 15.

The Bears can offer the Court no resolution of the conflict between Mr. Pierce's affidavit and the Bears' online statement. The discrepancy does show, however, that at this point, the Bears and their counsel do not appear to have a firm grasp on how the Bears manage their relevant policies. Whatever the proper resolution of the discrepancy, it further supports Beckman's argument that the Bears have not answered his arguments and that the Court should grant him preliminary relief.

## CONCLUSION

For the foregoing reasons, Beckman respectfully requests that the Court grant his motion for a temporary restraining order and preliminary injunction.

        /s/ H. Jefferson Powell
        *H. Jefferson Powell*
        Email: powell@law.duke.edu
        Phone: 919-613-7168
        *Nicole Jean Ligon*
        Email: ligon@law.duke.edu
        Phone: 919-613-7470
        *First Amendment Clinic at Duke Law School*
        *210 Science Drive*
        *Durham, North Carolina 27708*

        /s/ Michael R. Lieber
        *Michael R. Lieber*
        LIEBER LAW GROUP, LLC
        123 North Wacker Drive, Suite 1600
        Chicago, Illinois 60606
        Email: mlieber@lieberllc.com
        Phone: 773-354-6453

        *ATTORNEYS FOR PLAINTIFF*
        *RUSSELL BECKMAN*

December 10, 2018

## **CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing was served on all counsel of record *via* the Court's ECF System on December 10, 2018.

Respectfully submitted,

/s/ H. Jefferson Powell
*H. Jefferson Powell*
Email: powell@law.duke.edu
Phone: 919-613-7168
*Nicole Jean Ligon*
Email: ligon@law.duke.edu
Phone: 919-613-7470
*First Amendment Clinic at Duke Law School*
*210 Science Drive*
*Durham, North Carolina 27708*

/s/ Michael R. Lieber
*Michael R. Lieber*
LIEBER LAW GROUP, LLC
123 North Wacker Drive, Suite 1600
Chicago, Illinois 60606
Email: mlieber@lieberllc.com
Phone: 773-354-6453

*ATTORNEYS FOR PLAINTIFF*
*RUSSELL BECKMAN*