IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RUSSELL BECKMAN, | ) |
| | ) Case No. 17-cv-04551 |
| Plaintiff, | ) |
| | ) Judge Joan B. Gottschall |
| v. | ) |
| | ) |
| CHICAGO BEAR FOOTBALL CLUB, et al., | ) |
| | ) |
| | ) |
| Defendant. | ) |

# ORDER

Russell Beckman ("Beckman") filed a complaint under 42 U.S.C. § 1983 against the Chicago Bears Football Club, Inc. ("Bears") and the National Football League ("NFL"). According to his complaint, Beckman is a "Chicago Bear personal seat license ("PSL") owner" who has five corresponding season tickets," Compl. 6 ¶ 1, ECF No. 6. The Bears have a rewards program under which season ticket holders earn points that can be redeemed for the right to participate in one or more premium experiences. *See* Compl. ¶ 3. This litigation concerns a premium experienced called the "Pregame Warm-up Field Credential Experience" ("PWFCE"). PWFCE participants receive an opportunity to walk and stand on the northeast corner and end zone of the Bears' playing field in Chicago's Soldier Field during pre-game warm-ups. Compl., Ex A 10, Ex. D 1. At issue is a Bears rule enforced against Beckman forbidding PWFCE participants from wearing the opposing (visiting) team's gear. *See* Compl. ¶¶ 4–5, 7–10.

Beckman contends that this rule violates the Free Speech Clause of the First Amendment. He attempted to participate in the PWFCE before a game between the Bears and the Green Bay Packers in December 2016, but the Bears turned him away because he was wearing Packers gear.

1

*See* Compl. ¶ 5. Beckman alleges that the Bears and Packers play each other once a year, that he wants to wear his Packers gear while participating in the PWFCE at future Bears-Packers games, and that the Bears have made clear to him, through their published and personal communications, that he faces a "repeatable annual event." *Id*. ¶ III.B; *see also id.* III.C.7, IV.12.

The Bears and the NFL moved to dismiss Beckman's complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). The NFL also argued that the complaint did not demonstrate that Beckman had standing to sue the NFL. *See* Fed. R. Civ. P. 12(b)(1). In an opinion dated March 30, 2018, ("the opinion," ECF No. 27) this court dismissed the NFL, finding that "neither Beckman's complaint nor the statements on pages 17–19 of his response to the pending motion . . . establish that his injury is fairly traceable to the NFL." Slip op. at 13, 2018 WL 1561719, at *6 (N.D. Ill. March 30, 2018). The court denied the Bears' motion to dismiss, however, because it concluded that Beckman's complaint, when viewed in the light most favorable to him, adequately pleaded a First Amendment claim. *Id.* at 14–25 (stressing that the court decided only that the complaint was sufficient).

The Bears move the court to reconsider its First Amendment ruling. The team primarily contends that the court misunderstood the nature of the PWFCE program and therefore the Chicago Park District's ("CPD") relationship to the program. The motion has been fully briefed. Beckman represented himself when he filed his complaint, on the first motion to dismiss, and through the conclusion of briefing on the pending motion to reconsider. Attorneys representing Beckman have since filed notices of appearance.[1] *See* Notices, ECF Nos. 41, 42.

---

[1] The defendants also moved to strike Beckman's class action allegations. Beckman conceded that a self-represented litigant cannot undertake the complex task of serving as a class representative, and the court struck his

## I. Motions to Reconsider

The Federal Rules of Civil Procedure do not explicitly allow for a motion to reconsider. *Entm't USA, Inc. v. Moorehead Commc'n, Inc.*, 897 F.3d 786, 795 (7th Cir. 2018). Before entry of a final judgment, a motion to reconsider may be filed under Federal Rule of Civil Procedure 54(b) which provides that "any order . . . that adjudicates fewer than all the claims . . . does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment." *Galvan v. Norberg*, 678 F.3d 581, 587 & n.3 (7th Cir. 2012); *Pickett v. Prince*, 207 F.3d 402, 407 (7th Cir. 2000).

Rule 54(b) gives the court considerable discretion to reopen issues decided at an earlier stage of the case (the Seventh Circuit has characterized this discretion as "sweeping"). *Galvan*, 678 F.3d at 587 n.3. At the same time, the parties have a "right to expect consistency" from the court, *id.* at 587, and if our adversary system is to function efficiently, litigants must have every incentive to marshal their best arguments on the first try, *see Cehovic–Dixneuf v. Wong*, 895 F.3d 927, 933 (7th Cir. 2018) (quotations and citations omitted). There is, therefore, a general presumption against reopening decided issues "absent extraordinary circumstances." *Galvan*, 678 F.3d at 587 (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)) (other citation omitted) (emphasizing that this presumption is "discretionary"); *see also Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571–72 (7th Cir. 2006) (stating reconsideration requires a "compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous"); *Pickett*, 207 F.3d at 407 (stating that the law of the case doctrine is "highly flexible, especially when a judge is being asked to reconsider his

---

class action allegations. *Beckman*, 2018 WL 1561719, at *11. Beckman has not asked the court to revisit his class action allegations now that he has counsel, and the court implies nothing about them.

own ruling."). Accordingly, motions for reconsideration may be used "to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (quoting *Keene Corp. v. Int'l Fidelity Ins. Co.*, 561 F. Supp. 656, 665 (N.D. Ill. 1982)).

Because "'manifest error' is not demonstrated by the disappointment of the losing party," *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (quoting *Sedrak v. Callahan*, 987 F. Supp. 1063, 1069 (N.D. Ill. 1997)), a motion for reconsideration cannot be used as a vehicle for "rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion," *Ahmed v. Ashcroft*, 388 F.3d 247, 249 (7th Cir. 2004) (quoting *Caisse Nationale de Credit Agricole*, 90 F.3d at 1270). Hence "[t]he repetition of previous arguments is not sufficient to prevail" on a motion to reconsider, *Ahmed*, 388 F.3d at 249 (quoting *United States v. $23,000 in U.S. Currency*, 356 F.3d 157, 165 n.9 (1st Cir. 2004), unless the court misunderstood the argument in the first place, *see Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191–92 (7th Cir. 1990) (quoting *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983)) (holding that a motion to reconsider lies where "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension"). The party seeking reconsideration bears the burden of explaining why the court should change its mind. *Ahmed*, 388 F.3d at 249.

## II. Analysis

The March 30, 2018, opinion answered two First Amendment questions: (1) does the complaint state a plausible claim of state action such that the First Amendment applies? and (2) does the complaint allege a plausible claim of viewpoint discrimination prohibited by the First

4

Amendment?  *See Beckman*, 2018 WL 1561719, at *6–11.  The Bears take issue with the court's analysis of the first question.  Mem. Supp. Mot. Reconsider 1, ECF No. 30.  Specifically, the Bears submit that the court proceeded from a flawed premise, namely that the PWFCE is a program for season ticket holders ("STH") rather than one for holders of a Personal Seat License ("PSL").  *Id.*  The court did not misunderstand this fact, and the arguments the Bears make regarding the distinctions between STH's and owners of a PSL do not demonstrate clear error.  To understand why, it is helpful to revisit briefly the court's analysis and certain provisions of the operating agreement.

As discussed in greater detail in the opinion, *see Beckman*, 2018 WL 1561719, at *7, deciding whether there is state action for First Amendment purposes entails a "necessarily fact-bound inquiry."  *United Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)).  "[A]t its most basic level, the state action doctrine requires that a court find such a 'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'"  *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 738 (7th Cir. 2015) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009)).  The court must ultimately make a "normative judgment" under which "[n]o one fact can function as a necessary condition [for state action] across the board" and no "set of circumstances [is] absolutely sufficient" to establish state action.  *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 816 (7th Cir. 2009) (quoting *Brentwood*, 531 U.S. at 295–96).

No one disagrees with the first step in the court's state action analysis.  The court began by identifying the "specific conduct of which the plaintiff complains" because "constitutional standards are only [triggered] when it can be said that the State is responsible for" that "specific

5

conduct." *Beckman*, 2018 WL 1561719, at *6 (quoting *Peery v. Chi. Hous. Auth.*, 791 F.3d 788, 789 (7th Cir. 2015)) (brackets omitted). Beckman, the court decided, challenges "the Bears adopting and communicating a policy prohibiting opposing team gear on the field during the PWFCE and then enforcing that policy on game day." *Id.* (citation omitted).

After identifying the challenged conduct, the court turned to Beckman's arguments that Soldier Field is a "publicly owned, publicly financed facility." *Beckman*, 2018 WL 1561719, at *8 (quotation omitted). The court explained that under the governing cases, the "mere existence of the Operating Agreement and its detailed nature[,] . . . [the] facts that Soldier Field was built with public money and that the CPD leases it to the Bears to hold football games probably aren't enough to make the Bears' policy prohibiting opposing team apparel during the PWFCE effectively a CPD decision." *Id.* (citing *Hallinan*, 570 F.3d at 815–16); *see also id.* (discussing additional cases). Beckman reiterates that Soldier Field's construction was publicly funded in his response to the Bears' motion to reconsider, but he has not moved for reconsideration on this or any other ground. *See* ECF No. 36 at 13.

That brings us to the Operating Agreement under which the Bears lease Soldier Field from the CPD ("Operating Agreement"). *See* Operating Agreement, Resp. to Mot. to Dismiss Ex. A, ECF No. 24-1; *see also Beckman*, 2018 WL 1561719, at *2 (discussing certain provisions of the Operating Agreement). Section 11.2.5 of the Operating Agreement provides that:

> All Bears PSL Programs and all Bears PSL Agreements for Bears Games shall be subject to the approval of the CPD. The CPD agrees that such approval shall be granted unless such Bears PSL Programs and Bears PSL Agreements materially violate the rules of public policy of the CPD.

Operating Agreement §11.2.5, ECF No. 24-1 at 41. Based on this language and the complaint's allegations, this court decided that "it is at least plausible . . . that the CPD retained discretion to approve the PWFCE program at issue here." *Beckman*, 2018 WL 1561719, at *8. If that turns

6

out to be true, it would "go[ ] a long way toward proving state action" by "suggest[ing] the state's control over ostensibly private censorship." *Id.* (citing *Brentwood*, 531 U.S. at 297). The court also pointed to provisions of the Operating Agreement divvying up revenue:

> [T]he Operating Agreement allocates all revenue earned on game days to the Bears with the exception of parking. *See* Operating Agreement § 13.1.1, 13.2.3; *but see id.* § 13.2.6 (making exception for major NFL events like the Super Bowl to be negotiated with the NFL). An exception exists for a group of initial PSLs sold when the agreement commenced in 2001; the CPD gets the revenue from them. *See* Operating Agreement §§ 1.124, 11.1.1, 11.1.2. Beckman's complaint does not make clear whether he holds any initial PSL's, but even if he does not, the Operating Agreement says that the Bears and the CPD expected to sell about 30,000 initial PSLs. *Id.* § 1.124. When combined with the parking and rental revenues, the inference that the CPD gets a sizable portion of the revenues from PSLs at Soldier Field becomes plausible.

*Id.*

The court went off the rails here, according to the Bears, by conflating a personal seat license with a season ticket. *See* Mem. Supp. Mot. Reconsider 1, 4–6. In the Bears' words, a PSL "gives a person the right to purchase tickets for Bears games for a specified seat location for a specified period of time." Mem. Supp. Mot. Reconsider 3 (citing Operating Agreement § 1.104). As the court understands it, a PSL works like an option to buy a season ticket. *See* Operating Agreement § 1.104. The Bears argue that "the Court erred when it concluded that plaintiff Russell Beckman's eligibility to participate in the PWFCE program was based on his status as a holder of PSLs" rather than as a holder of season tickets. Mem. Supp. Mot. to Reconsider 1. Hence, continues the argument, the complaint does not plausibly allege state action because the CPD's rights to approve a "PSL program" (Operating Agreement § 11.2.5) and to receive revenue from initial PSL's (§ 11.1.2) have nothing to do with season ticket holder programs like the PWFCE. *See id.* at 4–6.

7

Contrary to the Bears' assertions, the court labored under no illusions about the PWFCE's eligibility criteria. The first sentence of the paragraph analyzing § 11.2.5 declares that "Beckman is a PSL holder seeking to participate in a premium experience available to season ticket holders." *Beckman*, 2018 WL 1561719, at *9. That accords with the following statement in the opinion's summary of the Operating Agreement. "The PWFCE provides *STHs and their guests* the opportunity to walk and stand on the northeast corner and end zone of the Bears' playing field . . . ." *Beckman*, 2018 WL 1561719, at *2 (quotation omitted; emphasis added) (reciting alleged facts). Earlier in the same paragraph of the March 30, 2018, opinion, the court differentiates between Beckman's PSL and his season tickets. *See id.* at *1 ("Beckman is a personal seat license ('PSL') owner with season tickets to the Bears." (citation omitted)). And the heading above that paragraph reads "The Bears Prevent Beckman from Participating in a Season Ticket Holder Experience While Wearing Packers Gear." *Id.*

The Bears point repeatedly to a paragraph introducing the opinion's substantive analysis, stating that the Operating Agreement "can be reasonably read as giving CPD the right to approve all PSL programs like the one at issue here." *Id.* at *6. This language does not contradict the passages quoted in the prior paragraph. Rather, this language, in context, underscores that what is in doubt, but is plausible at this stage, is the proposition that the PWFCE program qualifies as a "PSL program" within the meaning of § 11.2.5 of the Operating Agreement. Had the court thought that the PWFCE was open to PSL holders only, qualifying language like "can be read" would have been unnecessary since there would have been little doubt that the PWFCE is a PSL program.

The need to use qualified language when discussing § 11.2.5 arises precisely because a PSL works like an option to buy a season ticket, and the PWFCE appears to be for season ticket

8

holders. If all of the salient facts about the PWFCE program appeared in the record, it might be possible at the motion to dismiss stage to determine definitively whether the phrase "PSL program" reaches the Bears' PWFCE program[2], but "[c]ourts are reluctant to construe contracts at the motion to dismiss stage, especially if the contract language is ambiguous." *Wabash Castings, Inc. v. Fuji Mach. Am. Corp.*, 2016 WL 6432586, at *3 (N.D. Ill. Oct. 31, 2016) (citing *Bank of Am., N.A. v. Oberman, Tivoli & Pickert, Inc.*, 12 F. Supp. 3d 1092, 1100 (N.D. Ill. 2014)). The Bears do not approach the problem of § 11.2.5 from a contract interpretation perspective or offer a legal analysis of the Operating Agreement's language as applied to the facts Beckman alleges; they merely assert, repeatedly, that § 11.2.5 gives the CPD no say-so over the PWFCE program.[3] *See, e.g.*, Mem. Supp. Mot. to Reconsider 1, 4. Failing to cite legal authority does not carry the Bears' burden to demonstrate clear error in the court's decision to wait for further factual development before construing an ambiguous phrase in the Operating Agreement.

That is reason enough to deny the motion to reconsider. Nevertheless, Beckman submits additional evidence in his response, ECF No. 36, enhancing the plausibility of his state action

---

[2] Beckman has filed a motion for a temporary restraining order and preliminary injunction, and Beckman and the Bears have attached affidavits and exhibits to their preliminary injunction briefing which they claim are relevant to state action. *See* ECF Nos. 47-1, 47-2, 47-3, 48-1. Because briefing on Beckman's motion for preliminary injunction has not closed and because the motion is by definition preliminary, the court considers none of the preliminary injunction evidence when deciding the Bears' motion to reconsider. *See* Fed. R. Civ. P. 12(d) ("When matters outside the pleadings are presented to and not excluded by the court, the motion [to dismiss for failure to state a claim] must be treated as one for summary judgment. . .[, and] all parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."); *Kehoe ex. rel. A.B. v. Hous. Auth. of S. Bend*, 2011 WL 4005987, at *2 (N.D. Ind. Sept. 28, 2011).

[3] The CPD has not been made a party to this lawsuit, so the court does not know what it thinks the Operating Agreement means. The CPD's absence from this suit increases the court's reluctance to construe the Operating Agreement definitively. The Seventh Circuit has remarked that "a contracting party is the paradigm of an indispensable party." *Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 484 (7th Cir. 2001) (quoting *United States ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 479 (7th Cir. 1996)); *see also* Fed. R. Civ. P. 19(a). Particularly now that counsel has appeared for Beckman, the court encourages counsel to consider the joinder problem that may be raised by determining the rights and liabilities of the CPD and the Bears under the Operating Agreement.

claim, though the facts needed to construe § 11.2.5 are not fully developed. For one thing, the court does not appear to have all of the details of the rewards program. An excerpt from the Bears' website submitted by Beckman shows that owners of initial PSL's (Beckman has clarified that he owns one) earn rewards points at twice the rate of other season ticket holders. *See* ECF No. 36 at 7–9. That raises a myriad of questions bearing on whether the rewards program is a PSL program. How many initial PSL holders remain? Do the Bears intend the rewards program as an inducement to keep them or get them to buy more PSL's? Do season ticket holders see the rewards program as such an incentive? Has the adoption of the rewards program affected the rate at which season ticket holders buy PSL's? Beckman makes allegations from which it can be inferred that they do. He pleads that he owned three ordinary season tickets, in addition to his two tickets bought under the auspices of his initial PSL's, until 2016. Compl. ¶ 1. He bought three more PSL's "[i]n large part because [he] want[ed] to maintain [his] . . . ability to participate" in the PWFCE with his friends and family. Compl. ¶ 2. It is reasonable to infer, and so the court must at this stage, that season ticket holders see the PWFCE as an enticement to upgrade to PSL's. Because all of these matters potentially bear on whether § 11.2.5 applies to the PWFCE program, they further buttress the conclusion that dismissal at the Rule 12(b)(6) stage is inappropriate.

Before closing, the court considers it prudent to dispel any impression that it has narrowed Beckman's avenues of proving state action to showing the CPD reserved the right to approve the 'no opposing team attire' rule or that the CPD shares directly in revenue generated by the PWFCE program. Revisiting an example used in the March 30, 2018, opinion, the Supreme Court has found state action where a city transferred a public park to several ostensibly private trustees, but "the municipality remain[ed] entwined in [the park's] management [and]

10

control." *Evans v. Newton*, 382 U.S. 296, 301 (1966). Beckman's complaint does not allege that CPD security personnel were involved when he attempted to participate in the PWFCE in December 2016, s*ee Beckman*, 2018 WL 1561719, at *8, but the picture of the security arrangements for the PWFCE has not fully crystalized and may yet be relevant. Nor have the parties adequately explored how, if at all, the public/private partnership that funded the most recent renovation of Soldier Field affects the analysis, though Beckman alludes to the issue in his response.[4] *See* ECF No. 36 at 12–13. The court does not mean to imply anything about the ultimate resolution of these or any other issues, except to remind the parties that the state action issue is fact-intensive and fact-specific. *See Brentwood*, 531 U.S. at 295–96; *Hallinan*, 570 F.3d at 816.

### III. Conclusion

For the reasons stated, the Bears' motion for reconsideration, ECF No. 29, is denied.

Date: December 11, 2018                               /s/
                                                     Joan B. Gottschall
                                                     United States District Judge

---

[4] The Bears argue in their motion to reconsider that the Operating Agreement says that the CPD did not get any additional revenues from the initial PSL's sold in connection with the Soldier Field renovation project "[i]n the early 2000's." ECF No. 30 at 6 (quoting Compl., Ex. A at 2; citing Operating Agreement, ECF No. 24-1, § 1.124, at 11, § 11.1.4, at 40). Not only is the court reluctant to make this determination definitively without the CPD in this case, but the Bears also cite nothing to establish their next assertion that "[r]evenues that may have been received by the CPD more than a decade before the Bears created the PWFCE program cannot support an inference that the operations of the CPD and the Bears are somehow enmeshed with respect to the PWFCE." *Id.* at 5. The Bears have therefore waived this argument for the purposes of the present motion. *See Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 n.1 (7th Cir. 2014) ("Without any further analysis or citation to authority, we find this argument waived.") (citing *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009)). Furthermore, this argument appears to isolate the single fact of revenue sharing, but no single fact can be viewed in isolation when conducting a state action analysis. *See* the text *infra* and cases cited.