**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RUSSELL BECKMAN, | ) | |
| | ) | Case No. 17-cv-04551 |
| Plaintiff, | ) | |
| | ) | Judge Joan B. Gottschall |
| v. | ) | |
| | ) | |
| CHICAGO BEAR FOOTBALL CLUB, et al., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Russell Beckman ("Beckman") describes himself as a diehard fan of the Green Bay Packers, a professional football team whose rivalry with the Chicago Bears has been much celebrated. Beckman sued the Bears under the Free Speech Clause of the First Amendment and 42 U.S.C. § 1983 to challenge a rule against wearing the opposing team's clothing during a premium pregame experience for season ticket holders called the Pre-Game Warmup Field Credential Experience ("PWFCE"). The Bears are scheduled to play the Packers at Soldier Field in Chicago on December 16, 2018. Beckman moves for a temporary restraining order ("TRO") and preliminary injunction[1] compelling the Bears to allow him to wear Packers gear while participating in the PWFCE before that game. The parties argued the motion at a hearing held December 12, 2018 ("oral argument"). For the reasons that follow, the court denies Beckman's motion.

---

[1] The court treats the two motions as equivalent at this juncture, since the parties do not distinguish them.

1

## I. Background

No discovery has been conducted. Beckman filed his original complaint against the Bears and the National Football League, ECF No. 6, and the defendants moved to dismiss it. The court granted the motion in part, finding that the complaint stated a plausible First Amendment claim against the Bears, but Beckman did not demonstrate that he had standing to sue the NFL. *Beckman v. Chicago Bear Football Club, LLC*, 2018 WL 1561719, at *6–11 (N.D. Ill. March 30, 2018). The Bears moved for reconsideration, and while the parties were briefing the instant motion for a TRO, the court denied the motion for reconsideration. ECF No. 51. The parties' principal dispute concerns Beckman's likelihood of success in showing that the Bears are a state actor to which the First Amendment applies rather than a private party. Consequently, the record the parties have built beyond the complaint concerns the relationship between the Chicago Park District ("CPD") and the Bears as well as the administration of the PWFCE program and the rewards program of which it is a part.

### A. **The Operating Agreement**

The CPD owns Soldier Field, which is a "publicly financed facility." *Beckman*, 2018 WL 1561719, at *8 (quotation omitted). The Bears lease Soldier Field from the CPD under a Permit and Operating Agreement dated August 1, 2001 ("Operating Agreement," ECF No. 24-1). The Bears pay the CPD an annual "Facility Fee"[2] to use the field. *Id.* § 14.1.1. The Operating Agreement makes the CPD responsible for "all Routine Maintenance," *id.* § 19.2.1, and for "performance and payment of security and crowd control on Game Days,"[3] except for the

---

[2] "Facility Fee," means "the annual fee (as such fee may be increased from time to time as provided herein) to be paid by the Club to the CPD in consideration for the Club's Use Rights with respect to the Facility, which is intended to reimburse the CPD for its actual expense." Operating Agreement § 1.96.

[3] As defined in the Operating Agreement, "Game Day" means "the days on which Bears Games are played at [Soldier Field]" and "Field" means the "playing field, end zone and sidelines." Operating Agreement §§ 1.98, 1.115.

"locker room[s], Team Areas and the Field." Operating Agreement § 25.1. Generally, the Bears receive all game day revenues except for parking under the Operating Agreement. *See* Operating Agreement § 13.1.1, 13.2.3; *but see id.* § 13.2.6 (exception for certain special events).

### B. PSLs And Season Tickets

Many of the parties' disputes center on the distinction between season tickets and Personal Seat Licenses ("PSLs") and how they interact. The Operating Agreement defines "Football PSL[s]" as "contractual agreement with a licensee by which the licensee receives the right to purchase tickets to Bears Games at a specified seat location in the Facility for a designated period of time." Operating Agreement § 1.104; *see also id.* § 1.194 (defining "Public Sector Event Sponsor PSLs"). And § 11.2.5 of the Operating Agreement provides that "[a]ll Bears PSL Programs and all Bears PSL Agreements for Bears Games shall be subject to the approval of the CPD."

This court has previously remarked that one way to think about a PSL is as an option to buy a season ticket. Based on the parties' representations at oral argument, the option analogy appears to paint a somewhat incomplete picture, for a PSL owner may be required to buy the season ticket. Instead, it appears that the PSL holder does not need to worry about getting on a waiting list, when there is one, for a season ticket each year or about changing seats from year to year.

The Operating Agreement, which, again, was signed in 2001, contemplated a "project" undertaken by the Bears and the CPD to renovate Soldier Field and surrounding structures. *See* Operating Agreement § 1.184. As partial financing for the renovation, a group of "Initial Football PSLs" would be sold. *See id.* §§ 1.124, 11.1. The CPD kept the proceeds from sales of

the initial PSLs. *Id.* § 11.1.2. The proceeds of sales from future PSLs go to the Bears, however, *id.* § 11.2.2, and the CPD no longer sells PSLs.

The court was told at oral argument that the seats corresponding to the initial PSLs are today located on the east side of Soldier Field in an area designated by the Bears as the "United Club." *See* Beckman Aff. ¶ 16, ECF No. 48-1. The Bears' website says, and the Bears do not dispute, that owning a PSL (but not an initial PSL) is a prerequisite for buying a season ticket in a United Club seat. *Id.* ¶ 15. For seats outside the United Club block, a PSL does not appear to be required.

Neither the number of initial PSLs sold nor the amount of money the sales generated appear in the record. The Operating Agreement projected that "approximately 30,000" would be sold. Operating Agreement § 1.124.

### C. Beckman's PSLs And Season Tickets

Beckman owns two initial PSLs and two corresponding season tickets in United Club seats. Beckman Aff. ¶ 16. He has owned them since 2003. *Id.*

Beckman has three more season tickets for seats not located in the United Club area. Compl. ¶ 1, ECF No. 6. Beckman initially had just season tickets for these three seats; he upgraded to PSLs "[i]n large part because [he] want[ed] to maintain [his] ability to . . . participate" in the PWFCE with his friends and family. Compl. ¶ 2.

### D. The PWFCE Program

PWFCE participants receive the opportunity to walk and stand on the northeast corner and end zone of the playing field during pre-game warm-ups. Compl., Ex A 10, Ex. D 1. The Bears' counsel described the program at oral argument. Participants show up about two hours before the game at a lower entrance to Soldier Field. Each presents a certificate and receives a

4

credential allowing the participant to be present on the field. They are then taken as a group onto the field where they stand inside a yellow line and watch the players warm up before the game.

The PWFCE is a part of the Bears' rewards program for season ticket holders. *See* Pierce Aff. ¶ 4, 7, 8, Dec. 5, 2018, ECF No. 47-3. According to the Bears, the program's goals are "creating unique experiences for season ticket holders, encouraging engagement with the Bears' fan base, fostering team spirit, and rewarding loyal Bears fans." *Id.* ¶ 10. Under the program, season ticket holders earn points they can redeem for various "perks" and use to "attend events," including the PWFCE. *Id.* ¶ 4.

Brendan Pierce, the Bears' Director of Ticket Sales and Service, avers that the Bears "do not generate any revenues in connection with the exclusive [season ticket holder] Experiences or the PWFCE." *Id.* ¶ 7. And the Bears send the CPD no revenue from the PWFCE or season ticket holder experiences. *Id.*

The rules governing eligibility for the PWFCE and earning rewards points remain somewhat murky. Pierce avers that "[e]ligibility to participate in the STH [season ticket holders] Experiences program, and the PWFCE, is determined by the Bears and is currently based solely on a person's status as a Bears' season ticket holder." Pierce Aff. ¶ 5. "A person," adds Pierce, "does not receive additional points for the STH Experiences program if they also happen to own a PSL." *Id.* ¶ 6. Still, certain categories of season ticket holders earn rewards points faster than others. *See id.* ¶ 6; Beckman Aff. ¶ 15. An ordinary season ticket holder earns one point per seat. *Id.* ¶ 6. Certain "club" season ticket holders earn two. *Id.* The Bears also dole out additional points to people who have held a season ticket for an extended period of time. Pl.'s Resp. to Mot. to Reconsider 8, ECF No. 36. Club seats, as used here, fall into three categories: (1) the United Club seats discussed earlier; (2) certain seats in the south end zone referred to by

5

the Bears as the "Touchdown Club;" and (3) seats in an area referred to as the "Sideline Club." *See* Pierce Suppl. Aff. ¶ 5, Dec. 11, 2018, ECF No. 52-2; Pl.'s Resp. to Mot. to Reconsider 9 (graphic of Bears web page stating policy). While a PSL is required for the first category, the second and third blocks of seats do not require a PSL before a season ticket can be purchased. *See* Pierce Suppl. Aff. ¶ 5.

Regarding security for the PWFCE, Pierce points to language in the Operating Agreement making the Bears responsible for the security of the field, sidelines, and end zones. Pierce Aff. ¶ 14 (citing Operating Agreement § 25.1). The Bears' Director of Safety and Security, John Tarpey, avers that the Bears and the CPD have contracted with separate security firms to fulfill their respective security obligations. Tarpey Aff. ¶ 4, Dec. 11, 2018, ECF No. 52-1. Beckman took photographs of uniformed Chicago Police Officers on the field during a pre-game event at Soldier Field on September 30, 2018. *See* Beckman Aff. ¶¶ 11–13 & Ex. 1. Tarpey's affidavit responds by suggesting that the officers were "part of a program where officers monitor for weapons and terrorist threats at sporting events." Tarpey Aff. ¶ 6. According to Tarpey, the Bears and the Chicago Police Department have "agreed that the officers will not attempt to get involved in routine security matters related to the field, the end zones, and the sidelines. Instead, the officers are present for emergency purposes and will get involved only if there is a large scale emergency, terrorist attack, or a catastrophic event." *Id.* ¶ 7.

## II. Legal Standard

Temporary restraining orders and preliminary injunctions are intended to "minimize hardship to the parties pending the ultimate resolution of the lawsuit." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cross*, 1998 WL 122780, at *1 (N.D. Ill. Mar. 13, 1998) (citing

6

*Faheem–El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988)). "A temporary restraining order 'is an extraordinary and drastic remedy, which should not be granted unless the movant carries the burden of persuasion by a clear showing.'" *Checker Car Club of Am., Inc. v. Fay,* 262 F. Supp. 3d 621, 626 (N.D. Ill. 2017) (quoting *Recycled Paper Greetings, Inc. v. Davis*, 533 F. Supp. 2d 798, 803 (N.D. Ill. 2008)); *Sw. Airlines Pilots' Ass'n v. City of Chicago*, 186 F. Supp. 3d 836, 839 (N.D. Ill. 2016) (quoting *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005)). The party moving for a TRO must make "a threshold showing: (1) that the movant has some likelihood of success on the merits of the underlying litigation; (2) irreparable harm to the plaintiff; and (3) no adequate remedy at law exists." *Checker Car*, 262 F. Supp. 3d at 626 (quoting *Illusions Too Reality, LLC v. City of Harvey*, 2003 WL 260335, at *4 (N.D. Ill. Feb. 4, 2003)). The court must consider the balance of harms if this threshold showing is made by weighing "the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently and [by] consider[ing] the interest of the public in whether the injunction is to be granted or denied." *Id.* (same quotation); *see also Stuller, Inc. v. Steak N Shake Enter.,* 695 F.3d 676, 679 (7th Cir. 2012).

So far, this litigation has been about the sufficiency of Beckman's complaint. The court stressed the importance of the case's procedural posture when it denied the Bears' motion to dismiss Beckman's complaint. *See Beckman*, 2018 WL 1561719, at *9. When a defendant moves to dismiss a complaint for failure to state a claim upon which relief can be granted, the court assumes that all the facts alleged in the complaint are true and draws all reasonable inferences about those facts in the plaintiff's favor. *See Collins v. Vill. of Palatine*, *Ill.*, 875 F.3d 839, 842 (7th Cir. 2017) (citing *McCauley v. City of Chicago*, 671 F.3d 611, 615–16 (7th Cir. 2011)); *Zahn v. N. Am. Power & Gas, LLC*, 847 F.3d 875, 877 (7th Cir. 2017). Those rules do

not apply to a motion for a TRO. *See Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chicago*, 45 F.3d 1144, 1154 (7th Cir. 1995) (contrasting standards). In briefing and arguing the instant motion, the Bears and Beckman go well beyond the complaint and its exhibits on the issue of state action. The First Amendment restricts the power of the government, and only the government; this requirement is often referred to as "state action." *E.g.*, *Luce v. Town of Campbell*, *Wis.*, 872 F.3d 512, 514 (7th Cir. 2017). The evidence that has come to light in the TRO process has diminished Beckman's prospects of establishing state action. Weighing those prospects with the other factors that must be considered, the court denies Beckman's motion for a TRO.

## A. **Waiver**

The court must first determine which arguments and evidence are properly before it. On December 6, 2018, Beckman filed a motion seeking leave to supplement his motion for a TRO with his affidavit and several photographs, *see* ECF No. 48-1 (collectively "supplemental evidence"). The Bears had already filed their response, ECF No. 47, by that time, and they contend that Beckman's supplemental evidence must be disregarded under the general rule that an argument made for the first time in a reply is waived. *See* Surreply 1, ECF No. 52 (quoting *Nationwide Ins. Co. v. Cent. Laborers' Pension Fund,* 704 F.3d 522, 527 (7th Cir. 2013)). Also, the Bears' lawyer argued that the plaintiff advanced several new legal and factual theories at the hearing held December 12, 2018, and compared defending Beckman's motion to playing a game of "whack-a-mole."

Beckman's supplemental evidence will be considered. The rule that a party waives an argument by waiting until a reply to make it ensures that the party opposing the motion has "'a meaningful opportunity to be heard.'" *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595–96

8

(7th Cir. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)). Here, the Bears sought and received that opportunity when they asked for, and obtained, permission to file a surreply responding to Beckman's supplemental affidavits and evidence. *See* Minute Order, Dec. 7, 2018, ECF No. 49. The Bears did so, ECF No. 52, and they took advantage of an additional opportunity to respond to Beckman's supplemental evidence at the hearing held December 12, 2018. Beckman's supplemental affidavit and the arguments made in his reply are therefore properly before the court.

But the court will not consider, or resolve, the contested factual arguments raised for the first time at the hearing held December 12, 2018. When the December 12, 2018, hearing was scheduled, the parties told this court that they did not see a need to call witnesses and would present argument on the briefing and evidence. That is, the December 12, 2018, hearing would effectively be an oral argument (a phrase used by Beckman's attorney). Counsel made some uncontested representations that the court understood to be of a clarifying nature at oral argument. Those representations will be considered. As for contested factual assertions newly raised on December 12, 2018, arguments raised for the first time at oral argument are "thoroughly waived." *Argyropoulos v. City of Alton*, 539 F.3d 724, 740 (7th Cir. 2008) (quoting *Lear v. Cowan*, 220 F.3d 825, 828–29 (7th Cir. 2000)).

The court will not attempt to catalog the issues raised for the first time on December 12, 2018, but Beckman's factual assertions, mentioned nowhere in the briefing, that the Bears make an experience similar to the PWFCE available for a fee to anyone with a ticket to a Bears game at Soldier Field are a good example. Beckman pressed this contention on the question of irreparable injury to the Bears because participants can wear opposing team gear while on the field. The facts surrounding this program came to light in real time as the attorneys responded to

9

each other at oral argument. The Bears told the court at the end of the hearing that the program has been discontinued, but the court still does not know where on Soldier Field participants in this program physically stood, a matter that has a bearing on how similar to the PWFCE the program was. The lack of clarity on these points illustrates the importance of providing adequate notice and opportunity to be heard, for the court has no reason to think Beckman gave the Bears notice sufficient to permit it to gather the facts and evidence needed to respond.

### B. Likelihood of Success on the Merits

The court set forth the principles controlling the state action inquiry at the motion to dismiss stage. *See Beckman*, 2018 WL 1561719, at *6. Because the Fourteenth Amendment "erects no shield against merely private conduct, however discriminating or wrongful," neither does the First Amendment when applied to the states through the Fourteenth Amendment. *Murphy v. Mount Carmel High Sch.*, 543 F.2d 1189, 1193 (7th Cir. 1976) (quoting *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948); *accord Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988). Since the Bears are organized as a limited liability corporation, it does not qualify as a state actor. *See, e.g.*, *Peery v. Chi. Hous. Auth.*, 791 F.3d 788, 790–91 (7th Cir. 2015).

For the First Amendment to apply, then, Beckman must establish "such a 'close nexus between the State and the challenged action' that the challenged action may be fairly treated as that of the State itself.'" *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 738 (7th Cir. 2015) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009) (brackets omitted)). The Supreme Court has articulated various tests used to inform that decision. They include the "symbiotic relationship test, the state command and encouragement test, the joint participation doctrine, and the public function test." *Id.* (quoting *Rodriguez*, 577

10

F.3d at 823–24). The Court has characterized the state action inquiry as a "necessarily fact-bound inquiry." *Brentwood*, 531 U.S. at 298 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. at 939). "Over time, Supreme Court and Seventh Circuit precedent have revealed that these cases do not so much enunciate a test or series of factors, but rather demonstrate examples of outcomes in a fact-based assessment." *Hallinan,* 570 F.3d at 816 (citing *Brentwood*, 531 U.S. at 295 and *Tarpley v. Keistler*, 188 F.3d 788, 792 (7th Cir. 1999)). The court ultimately makes a "normative judgment" under which "[n]o one fact can function as a necessary condition [for state action] across the board" and no "set of circumstances [is] absolutely sufficient" to establish state action. *Id.* (quoting *Brentwood*, 531 U.S. at 295–96). What has emerged of the facts and circumstances here diminishes, but does not destroy, Beckman's chances of proving state action.

In his motion for a TRO, Beckman relies primarily, if not exclusively, on the language of § 11.2.5 of the Operating Agreement. Again, that section says that "[a]ll Bears PSL Programs and all Bears PSL Agreements for Bears Games shall be subject to the approval of the CPD." At the motion to dismiss stage, the court determined that "it is at least plausible that in Section 11.2.5, the CPD retained discretion to approve the PWFCE program." *Beckman*, 2018 WL 1561719, at *9. On reconsideration, the court explained that this conclusion was necessarily tentative in large part because the facts of how the rewards and PWFCE programs work were not clear and because the parties have yet to approach the meaning of § 11.2.5 as a contract interpretation problem. *Id.*

On the present motion, the Bears come closest to a contract interpretation argument by submitting the affidavit of the CPD's General Counsel, Timothy M. King. *See* King Aff. ¶ 2, Dec. 5, 2018, ECF No. 47-2. King traces § 11.2.5's term "Bears PSL program" through several clauses of the Operating Agreement. *See id.* ¶¶ 6–7. He concludes that the phrase means the

same thing as the defined term "Future Football PSLs program." *Id.* That term is defined as a "contractual agreement with a licensee by which the licensee receives the right to purchase tickets to Bears Games at a specified seat location in the Facility for a designated period of time." Operating Agreement §§ 1.104, 1.110. King then proceeds without analysis to his conclusion that "PSL Programs" covered by § 11.2.5 refer to "the programs that result in contractual agreements with licensees that" meet the definition of a PSL. King Aff. ¶ 8. King then proceeds without analysis to his conclusion that "PSL Programs" covered by § 11.2.5 refer to "the programs that result in contractual agreements with licensees that" meet the definition of a PSL. *Id.* ¶ 8.

King does not purport to bind the CPD on the meaning of the Operating Agreement. And his interpretation cannot bind this court, save insofar as it is persuasive, because contract interpretation is ordinarily a legal question for the court. *See In re Sw. Airlines Voucher Litig.*, 898 F.3d 740, 743–44 (7th Cir. 2018) (citing *Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624, 631 (7th Cir. 2010)); *Pro in S.A. v. La Salle Bank, N.A.*, 223 F. Supp. 2d 960, 966 (N.D. Ill. 2002) (citing *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998)). Nor is the court persuaded. Accepting King's reading of § 11.2.5 does not resolve the key question. Beckman has stated that the PWFCE program motivated him to upgrade his three ordinary season tickets to PSLs. In a sense, to use King's words, the PWFCE "result[ed] in" Beckman's forming PSL "contractual agreements" in 2016 when he upgraded. King Aff. ¶ 8. The court's question is whether this sort of a cause-effect relationship is enough to make the PWFCE a PSL program, and King's affidavit supplies no analysis answering it.

Nevertheless, King's affidavit tends to show that, regardless of what the Operating Agreement means, the CPD did not think it had the power to approve the PWFCE or the rewards

12

program in 2015, so the CPD did not become involved, *de facto*, in either program.  *See* King

Aff. ¶ 9.  That tends to diminish the chances that the CPD, de facto, is "entwined in [the Bears']

management or control."[4]  *Brentwood*, 531 U.S. at 296 (quotation omitted).

      The information that has come to light about the PWFCE and rewards programs further

erodes Beckman's chances of showing that the Bears and the CPD are entwined.  Beckman

makes a little headway with his photographs of Chicago Police Officers patrolling the sidelines

on September 30, 2018.  *See* Beckman Aff. ¶¶ 11–13 & Ex. 1.  For all the court can tell from the

record as it stands, however, the CPD's explanation that the officers Beckman saw are on the

field for a different purpose and would not become involved in routine security matters

(presumably the PWFCE counts as routine) is credible.

      To be sure, Beckman has shown some likelihood of succeeding on the merits.  Beckman

does not dispute that season ticket holder status, not PSL ownership, determines eligibility to

participate in the PWFCE.  Pierce Aff. ¶ 5, ECF No. 47-3.  The evidence in the record contradicts

Pierce's averment that "[o]wning a PSL does not impact eligibility, how points are awarded, or

degree of participation in the STH Experiences program."  *Id.* ¶ 6.

      But on this record, the impact of PSL ownership on the PWFCE program turns out to be

considerably more attenuated than it looked at the complaint stage.  Beckman bought his two

initial PSLs in the United Club section in 2003, paying the CPD.  *See* Beckman Aff. ¶ 16;

Operating Agreement § 11.1.2.  In the ensuing 15 years, he has bought season tickets and PSLs

from the Bears, which is entitled to all the proceeds of those sales.  *See* Operating Agreement

---

[4] At oral argument, Beckman's attorney suggested that the CPD approved the PWFCE by acquiescing in it.  This argument does not appear in the briefs, and counsel cited no authority for his argument.  Accordingly, the court disregards this argument for purposes of deciding the present motion.

§ 11.2.2. Beckman connects his initial PSLs to the PWFCE via a long, straight line. It begins with the 2003 purchase of the initial PSL, stretches to the rule that a PSL is needed to get a season ticket for United Club seats, and terminates with the Bears' 2016 decision to award double points to United Club and other season ticket holders. The straightness of this imaginary line illustrates the difficulties Beckman faces. The line would ideally be more like a braid to establish state action. Speaking broadly, the more entwined the public-private relationship, the greater the chances of success in showing that the private party is a state actor. *See Brentwood*, 531 U.S. at 926 (asking whether plaintiff demonstrated "pervasive entwinement of public institutions and public officials in its composition and workings").

To date, Beckman has yet to identify a case finding state action in the administration of an analogous rewards program. That further undermines his likelihood of success. Beckman's lawyer suggested at oral argument that discovery would unearth evidence of numerous meetings and interactions between the CPD and the Bears. Those allegations do not even appear in Beckman's complaint, and speculation will not do. Beckman must make a "clear showing" to obtain a TRO. *Checker Car*, 262 F. Supp. 3d at 626 (quoting *Recycled Paper Greetings*, 533 F. Supp. 2d at 803).

Finally, the court remains unpersuaded by a version of an argument which it has already rejected. At the motion to dismiss stage, this court explained why, under the cases, "the facts that Soldier Field was built with public money and that the CPD leases it to the Bears to hold football games probably aren't enough to make the Bears' policy prohibiting opposing team apparel during the PWFCE effectively a CPD decision." *Beckman*, 2018 WL 1561719, at *8. Beckman told the court at oral argument that Cook County and the City of Chicago financed the most recent Soldier Field renovation to the tune of $400 million. Counsel pointed to the private

14

financing of a stadium in Dallas, Texas, as a contrasting example. The Dallas stadium owner, the argument goes, is free to do as he wishes, but the First Amendment applies to the Bears because it made a deal with the government. One situation in which state action has been found involves delegation by the state of a "public function" to a supposedly private party. *Brentwood*, 531 U.S. at 295 (citing *West v. Atkins*, 487 U.S. 42, 56 (1988)). "Generally, allegations that a professional sports team leases public land, gets tax breaks, and gets some kind of public support, do not demonstrate that the team is a state actor when operating a sports facility, which is not a traditional governmental function." *Beckman,* 2018 WL 1561719, at *8 (citing *Ludwig's Drug Store, Inc. v. Forest City Enter., Inc.,* 2016 WL 915102, at *9 (E.D.N.Y. Mar. 4, 2016) and additional cases). Beckman's counsel has cited no case and offered no legal argument undermining the case law the court cited, so the court sticks to its decision. Accordingly, Beckman's reference to the existence of public financing, tax incentives, and the like add nothing to his chances of success on the merits.

To sum up, § 11.2.5 of the Operating Agreement remains a valid avenue of proving state action, but the evidence in the TRO record dampens Beckman's chances of succeeding on that or another state action theory. The court is aware that Beckman need only show a "better than negligible" chance of success on the merits of at least one of his claims. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008). The strength of that showing, here fairly small but more than negligible, affects the balancing of the other factors, for "[t]he more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its favor." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012) (quoting *Girl Scouts of Maintou*, 549 F.3d at 1100).

### C. Irreparable Injury And Lack of Adequate Remedy At Law

Showing irreparable injury requires "more than a mere possibility of harm," but "[i]t does not . . . require that the harm actually occur before injunctive relief is warranted." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No.1 Bd. of Educ.*, 858 F.3d 1034, 1045 (citing *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d, 765, 787 (7th Cir. 2011)). The Supreme Court has been clear that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for which backward-looking money damages are not an adequate remedy. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, when a First Amendment violation occurs, irreparable injury is presumed. *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 669–70 (7th Cir. 2008); *Wis. Vendors, Inc. v. Lake Cty.*, 152 F. Supp. 2d 1087, 1093 (N.D. Ill. 2001). When this presumption applies, the irreparable injury finding collapses into the plaintiff's likelihood of success on the merits of his First Amendment claim. *Entm't Software Ass'n v. Chicago Transit Auth.*, 696 F. Supp. 2d 934, 941 (N.D. Ill. 2010). Since Beckman has shown some likelihood of success on his First Amendment claim, the court presumes that he will suffer irreparable injury for which there is no adequate remedy at law without an injunction.

Presumptions can of course be rebutted, and the Bears say that Beckman's delay in moving for a TRO rebuts the presumption here. "Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm . . . ." *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F. Supp. 3d 1030, 1040 (S.D. Ind. 2018) (citing *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979)); *accord Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 903 (7th Cir. 2001).

Beckman's delay does not rebut the presumption of irreparable injury here. First, the Bears complain about Beckman's delay but do not explain how they were prejudiced. *See* Resp. 11–12, ECF No. 47. They note that the delay permitted Beckman to "manufacture an emergency," but they do not explain how their ability to present a response has been hampered here. *Id.* at 12; *see also J.A.W.*, 323 F. Supp. 3d at 1040. Indeed, the Bears' counsel told the court at oral argument that the Bears view the issues here as purely legal. So the court does not find that the Bears were "lulled into a false sense of security or had acted in reliance on the plaintiff's delay." Both factors cut against the Bears' argument. *Ideal Indus.*, 612 F.2d at 1025.

Additionally, Beckman represented himself when he filed his complaint in 2017, and a Bears-Packers game was scheduled for November 12, 2017, approximately 5 months after he filed his complaint. *See* Compl. ¶¶ 8, 9. Under the heading for relief sought, Beckman asked that the Bears be "ordered by the court to not enforce this rule for the 2017 season and subsequent seasons." *Id.* ¶ 14. Thus, Beckman knew what he wanted, but he did not appear to understand that he needed to file a motion to get it.[5] Beckman did not take the step of filing a separate motion for preliminary injunctive relief for over a year. He filed his motion, ECF No. 45, on November 29, 2018, just two weeks before the scheduled game. Beckman explains in his affidavit that he did not "retain" an attorney until October 2, 2018, and it took him another

---

[5] The Bears contend that Beckman's affidavit is carefully worded to give the appearance of a misunderstanding. They point out that Beckman only disclaims "retain[ing]" counsel, Beckman Aff ¶ 4, but stops short of averring that he received no legal help before his lawyers appeared in this case. The Bears point to a newspaper article published in June 2018 quoting Beckman as saying that he had a lawyer. *See* ECF No. 47-1. Beckman does not address the article, but even if Beckman had some sort of informal communications with a lawyer in June 2018, it would be rank speculation to find that those communications apprised Beckman of the need to file a motion for a TRO or preliminary injunction. Furthermore, the Bears' motion for reconsideration was fully briefed by June, and so waiting on a decision to provide further guidance before moving for a preliminary injunction would have been within the realm of a reasonable tactical choice in June.

month, until November 1, 2018, to find local counsel to represent him.  *See* Beckman Aff. ¶¶ 4–8.

In these circumstances, Beckman's delay does not undermine the presumption of irreparable injury.  Beckman has steadfastly maintained since he filed his complaint that he views participating in the PWFCE at each Bears-Packers game as a unique opportunity to show his support for the Packers with his friends and family.  *See* Compl. ¶¶ 11–15.  The Bears suggested at oral argument that Beckman could express his fandom while sitting in his seat.  As Beckman argues, the Bears call the PWFCE a "unique opportunity for Chicago Bears fans," Exhibit to Compl., ECF No. 6 at 34.  Beckman can hardly be blamed for thinking the PWFCE is an equally unique opportunity for a Packers fan.  Since this case's inception, Beckman has made clear that it is the unique experience of standing in the particular spot on the field the PWFCE affords him with other long-time season ticket holders—while wearing Packers gear—that will give him full enjoyment and will allow him to express himself fully.  *See, e.g.*, Compl. ¶¶ 11–15; *see also Elrod*, 427 U.S. at 373–74; *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990).  For these reasons, the presumption that Beckman will suffer irreparable injury for which there is no adequate remedy at law applies here.

### D. __Balance of Harms And Public Interest__

Having found the threshold requirements for injunctive relief satisfied, the court must "balance the harms faced by [the] parties and the public as a whole."  *Whitaker*, 858 F.3d at 1054 (citations omitted).  As previously discussed, this balance is struck "on a 'sliding scale' measuring the balance of harms against the moving party's likelihood of success."  *Id.* (quoting *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015)).  The scale slides because the balancing is intended to minimize the harm of a mistake about the plaintiffs' chances of success.

*See Girl Scouts*, *supra*, 549 F.3d at 1100. As the plaintiff's chances of success grow, the degree to which the balance of harms must favor him shrinks, and the converse is also true: as plaintiffs' chances fall, the balance must favor them more. *Whitaker*, 858 F.3d at 1054 (citing *Turnell*, 796 F.3d at 662).

The injuries to Beckman's First Amendment interests were just discussed. The Bears contend that, if an injunction issues in error, their constitutional rights will be violated. *See* Resp. 12–13, ECF No. 47. Pierce, the Bears' Director of Ticket Sales and Service, avers that prohibiting opposing team attire during the PWFCE advances the Bears' business interests. ECF No. 47-3 ¶ 10.

The Bears do not say with much specificity how they will be harmed or elaborate on the basis for their business judgments. *See* Pierce Aff. ¶ 10. They do not mention crowd safety, *see id.*, and they disclaimed at oral argument the notion that the interests of Bears fans equate to the public interest. The Bears appear to believe that seeing a person wearing Packers gear in the Bears' end zone will hamper their fans' enjoyment of the game. *Id.* The field is, after all, the focal point of Soldier Field. The court has no reason to gainsay that judgment. Indeed, it follows as a corollary to Beckman's position that wearing Packers gear at the exact physical place in the end zone he would occupy during the PWFCE has significant expressive value. Beckman tells the court that he wore Packers gear during the PWFCE in 2014 and 2015 without incident, but the Bears respond that it was a reassessment of its business interests in 2016 that led to the present rule. They have not told the court what specifically motivated the reassessment or how the decision was made. Also, the Bears give the opposing team a certain number of passes allowing visitors, who may wear the opposing team's gear, to be present on the side line on game day, Pierce Suppl. Aff. ¶ 3. The difference seems clear enough, however. Being on the opposing

19

team's side line implies an association with the opposing team while standing in the end zone mere feet away from Bears players warming up suggests to the average football fan something much more out of place.

On this scant record, then, balancing the harms seems to come down to choosing between the associational and enjoyment interests of Bears fans versus Packers fans, but that cannot be and is not this court's role, especially without a record on the matter. The Bears have made a decision on the subject, however, and they claim that they paid a great deal of money to lease Soldier Field to have the right to do so.

As the Bears point out, private actors have a right guaranteed by the Due Process Clause to exclude from their property speakers with whom they disagree.[6] *Bessey v. Spectrum Arena, L.P.*, 2011 WL 6779306, at *7 (E.D. Pa. Dec. 23, 2011) (citing *Kaiser Aetna v. United States*, 444 U.S. 164 (1979)). Accordingly, if there is no state action, the Bears' property rights stand to be infringed, and so the balance of harms stands essentially in equipoise between Beckman and the Bears, depending on Beckman's likelihood of showing state action. *See id.*

### IV. Conclusion

For the reasons stated, Beckman has made a fairly modest showing that he is likely to succeed in demonstrating that the Bears are a state actor. Under the sliding scale approach, Beckman's burden to show that the balance of public and private harms tips in his favor increases accordingly. *See Planned Parenthood of Ind.*, 699 F.3d at 972. The court finds the balance of harms to be essentially neutral here, and that is not enough with such a modest

---

[6] The Bears also cite cases involving compelled government speech. *See, e.g.*, *Janus v. Am. Fed'n of State, Cty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018). They have not developed an argument that Beckman's participation in the PWFCE will be seen as an endorsement by the Bears, however, and so the argument must be deemed waived.

showing of likely success on the merits. Beckman's motion for a TRO or preliminary injunction, ECF No. 45, is therefore denied.


Date:   December 13, 2018                          _____/s/_____

                                                   Joan B. Gottschall
                                                   United States District Judge